# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JOSEPH GENTILE, JR.,
Defendant and Appellant.

S256698

Fourth Appellate District, Division Two
E069088

Riverside County Superior Court
INF1401840

December 17, 2020

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Cuéllar, Kruger, Groban, and Grimes\* concurred.

---

\*      Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. GENTILE

S256698


Opinion of the Court by Liu, J.


When an accomplice aids and abets a crime, the accomplice is culpable for both that crime and any other offense committed that is the natural and probable consequence of the aided and abetted crime. Natural and probable consequences liability can be imposed even if the accomplice did not intend the additional offense. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) In *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), we held that natural and probable consequences liability cannot extend to first degree premeditated murder because punishing someone for first degree premeditated murder when that person did not actually perpetrate or intend the killing is inconsistent with "reasonable concepts of culpability." (*Id*. at p. 165; see *id*. at p. 166.)

In 2018, the Legislature enacted Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) after determining that there was further "need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § l, subd. (b).) Among other things, Senate Bill 1437 amended Penal Code section 188 to provide that "[e]xcept as stated in subdivision (e) of Section 189 [governing felony murder], in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (Pen. Code, § 188, subd. (a)(3); all undesignated statutory references are to the Penal Code.) We

1

are asked to decide the effect of this amendment on the natural and probable consequences doctrine as it applies to second degree murder.

We hold that Senate Bill 1437 bars a conviction for second degree murder under the natural and probable consequences theory. We further hold that the procedure set forth in section 1170.95 is the exclusive mechanism for retroactive relief and thus the ameliorative provisions of Senate Bill 1437 do not apply to nonfinal judgments on direct appeal.

## I.

In June 2014, Guillermo Saavedra was found beaten to death inside La Casita restaurant in Indio where he lived and worked as the caretaker. Near his body was a broken chair, a broken beer bottle, a wooden stick, and a broken golf club with Saavedra's blood on it, as well as bloody shoe and sock prints. Also found in the restaurant were cigarette butts containing DNA from defendant Joseph Gentile, Jr., his ex-wife Saundra Roberts, and Saavedra.

Around 1:00 a.m. the day before Saavedra's body was found, surveillance footage captured Gentile wandering around the nearby Royal Plaza Inn. Several minutes later, another camera outside a laundromat next to the Royal Plaza Inn showed Gentile with Roberts and Roberts's boyfriend Stephen Gardner. When a detective retraced Gentile's steps from the surveillance footage, he found a bloody sock containing Saavedra's DNA as well as DNA consistent with Gentile's profile.

Gentile was charged with one count of first degree premeditated murder (§ 187, subd. (a)) with sentencing enhancements for personal use of a deadly weapon (*id.*,

§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)) and for one prior conviction (*id.*, § 667.5, subd. (b)).

At trial, the prosecution and Gentile presented dueling accounts of the events surrounding Saavedra's death. Saundra Roberts was the primary witness for the prosecution. She testified that on the day Saavedra was killed, Roberts, Gentile, and Saavedra met at La Casita restaurant. The three talked and drank alcohol there into the evening. At one point, Gentile and Saavedra got into an argument, but they remained friendly and there was no violence. After several hours, Roberts felt drunk and left to go sleep at a homeless encampment about one block away. When Roberts woke up around 1:00 a.m. or 1:30 a.m. that night, she went to a nearby convenience store and saw Gentile across the street in the parking lot of the Royal Plaza Inn. Roberts approached Gentile and saw that his shirt was wet. Roberts recalled Gentile saying that he had gotten into a fight with a man, that he "hurt him pretty bad," and that he "might have killed" him. Roberts called Gardner and asked him to bring a spare set of clothes, which he did. When Gardner arrived and realized that the clothes were for Gentile, he became angry and left. Roberts said she then left and did not see Gentile again.

Gentile provided a different account to the police. He said that when he arrived at the restaurant to meet Roberts, there was a man there he had never met. Roberts told Gentile that she was staying at the restaurant with the man. At some point, Roberts also told Gentile that the man had "been raping" her. Gentile then punched the man several times but did not use any weapon. Roberts then said the man would never rape her again, and she began hitting him with what Gentile thought was a sledgehammer. Gentile took the weapon away from Roberts,

but she retrieved it and resumed hitting the man. Gentile took the weapon away from Roberts a second time, threw it to the ground, and left the premises. Gentile denied ever striking the man with a weapon.

Gentile's friend Charlotte Sullivan testified that Gentile was scheduled to visit her in Imperial Beach during the Fourth of July weekend in 2014. In late June, around the time that Saavedra was killed, Gentile called to ask if he could come out earlier than planned. When she agreed, Gentile came out later that same day. When he arrived, Gentile's hands were swollen, but he did not initially mention anything about being in or witnessing a fight. Eventually, Gentile told Sullivan that he had gotten into a fight with another man. He said that he was drunk and that Roberts had told him the other man had raped her. Gentile said he punched the other man a few times, but eventually the man apologized and Gentile stopped hitting him. At that point, Gentile said, Roberts had picked up a club and started hitting the man with it. Gentile was arrested at Sullivan's residence on June 28, 2014. Sullivan testified that a day after the arrest, Roberts called her and said that the man who was killed had raped her and that Gentile got upset about it. Roberts also said that Gentile and the man got into a fight and that she left before anything else happened. Further, according to Sullivan, Roberts said that she later went back to the restaurant, "bleached everything," and cleaned up the mess.

The trial court instructed the jury on three separate theories of first degree murder: (1) that Gentile was the direct perpetrator of the murder; (2) that he directly aided and abetted Roberts in the commission of murder; and (3) that he aided and abetted Roberts in the commission of felony assault with a deadly weapon (§ 245, subd. (a)(1)), the natural and probable

consequence of which was death. During deliberations, the jury asked the court, "Are fists considered a deadly weapon?" The court responded, "No." The jury then convicted Gentile of first degree murder and found not true that he personally used a deadly weapon. The prosecution dismissed the prison prior, and the court sentenced Gentile to 25 years to life in prison.

A series of appeals followed. In Gentile's first appeal, the Court of Appeal reversed his murder conviction after finding that the natural and probable consequences jury instruction for first degree murder violated *Chiu, supra,* 59 Cal.4th 155. (*People v. Gentile* (Feb. 27, 2017, E064822) [nonpub. opn.] (*Gentile I*).) The court found it "probable that the jury convicted defendant on an unauthorized legal theory" because the trial court had instructed the jury on the natural and probable consequences theory and the jury did not find that Gentile used a deadly or dangerous weapon in committing the crime, suggesting that the jury did not think he was the actual perpetrator. (*Ibid.*) The Court of Appeal remanded the case for the prosecution to decide whether to "retry [Gentile] for the first degree murder under theories other than natural and probable consequences" or to accept reduction of Gentile's conviction to second degree murder. (*Ibid.*) It did not reach Gentile's other claims.

On remand, the prosecution elected to accept a reduction to second degree murder, and Gentile was sentenced to a prison term of 15 years to life. Meanwhile, on September 30, 2018, the Governor signed Senate Bill 1437 into law, which, effective January 1, 2019, amended the Penal Code to modify accomplice liability for murder and the felony murder rule. (Stats. 2018, ch. 1015.)

Gentile appealed again, raising the issues the Court of Appeal left undecided in his first appeal. He also sought leave to file a supplemental brief arguing that Senate Bill 1437 applied retroactively to his conviction and that it eliminated second degree murder liability under a natural and probable consequences theory. The Court of Appeal rejected Gentile's arguments and affirmed his second degree murder conviction. (*People v. Gentile* (Nov. 15, 2018, E069088) [nonpub. opn.] (*Gentile II*).) It disposed of Gentile's Senate Bill 1437 argument in a footnote. Without deciding whether Senate Bill 1437 applied retroactively, the court concluded that Senate Bill 1437 "does not preclude convictions for second degree murder where the defendant is an active aider-abettor. We denied defendant's request because he was, at a minimum, an active aider abettor, if not the actual killer, for which a reduction to second degree murder was appropriate, pursuant to *People v. Chiu* (2014) 59 Cal.4th 155, 166." (*Ibid.*)

We granted Gentile's petition for review and transferred the case to the Court of Appeal to reconsider Gentile's second degree murder conviction in light of Senate Bill 1437 and "the court's determination, in defendant's prior appeal, that it is probable the jury convicted defendant of murder on the theory that he aided and abetted Saundra Roberts in a target crime that, as a natural and probable consequence, resulted in her murder of the victim." (*People v. Gentile*, S253197, Supreme Ct. Mins., Mar. 13, 2019.)

On reconsideration, the Court of Appeal again affirmed Gentile's second degree murder conviction. (*People v. Gentile* (May 30, 2019) E069088, review granted and opn. ordered nonpub. Sept. 11, 2019, S256698 (*Gentile III*).) It construed Gentile's argument to contend that Senate Bill 1437's

amendments to section 189 "eliminate[d] all murder liability for aiders and abettors." (*Ibid*.) The court concluded that such an interpretation of section 189 was contrary to the text of the statute and would conflict with our decision in *Chiu*. It reiterated that Gentile's conviction stands because "[a]t a minimum . . . [he] was a direct or active aider and abettor" of murder. (*Ibid*.) We granted review.

## II.

Senate Bill 1437 "amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § l, subd. (f).)

To further that purpose, Senate Bill 1437 added three separate provisions to the Penal Code. First, to amend the felony murder rule, Senate Bill 1437 added section 189, subdivision (e): "A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." Because Gentile was not prosecuted under a theory of felony murder, this provision is not at issue here. (§ 189, subd. (a).)

Second, to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) (section 188(a)(3)): "Except [for felony murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime."

Third, Senate Bill 1437 added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above.

Gentile argues that Senate Bill 1437's amendments to section 188 eliminate second degree murder liability under the natural and probable consequences doctrine and that his second degree murder conviction must be reversed. The Attorney General does not dispute Gentile's interpretation of Senate Bill 1437 but argues that the erroneous natural and probable consequences jury instruction in his case did not prejudice him. Exercising our independent judgment (see *People v. Lopez* (2020) 9 Cal.5th 254, 268), we agree with the parties that Senate Bill 1437 bars a defendant from being convicted of second degree murder under a theory that the defendant aided and abetted a crime, the natural and probable consequence of which was murder.

## A.

A person who aids and abets the commission of a crime is culpable as a principal in that crime. (§ 31.) Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime. (*People v. Francisco* (1994) 22 Cal.App.4th 1180, 1190.) Our law recognizes two forms of

liability for aiders and abettors. (*McCoy*, *supra*, 25 Cal.4th at p. 1117.) First, under direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.)

Second, under the natural and probable consequences doctrine, an accomplice is guilty not only of the offense he or she directly aided or abetted (i.e., the target offense), but also of any other offense committed by the direct perpetrator that was the "natural and probable consequence" of the crime the accomplice aided and abetted (i.e., the nontarget offense). (*Chiu*, *supra*, 59 Cal.4th at p. 161.) A nontarget offense is the natural and probable consequence of a target offense "if, judged objectively, the [nontarget] offense was reasonably foreseeable." (*Ibid*.) The accomplice need not actually foresee the nontarget offense. "Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' " (*Id.* at p. 162.)

Unlike direct aiding and abetting liability, culpability under the natural and probable consequences theory does not require an accomplice to share the direct perpetrator's intent. Instead, "[a]ider and abettor culpability under the natural and probable consequences doctrine is vicarious in nature" and " 'is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense' " may not be intended at all. (*Chiu*, *supra*, 59 Cal.4th at p. 164.) "[F]or example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that

murder, even if unintended, if it is a natural and probable consequence of the intended assault." (*McCoy*, *supra*, 25 Cal.4th at p. 1117.)

The natural and probable consequences doctrine is not circumscribed by the felony murder principle that prohibits murder convictions premised solely on a lesser included offense of the murder itself, such as felony assault. (See *People v. Ireland* (1969) 70 Cal.2d 522, 539–540.) The natural and probable consequences doctrine also differs from the law of conspiracy, which holds a person liable for crimes that he or she agreed with one or more persons to commit and that a member of the conspiracy committed in furtherance of the agreement. (See *People v. Smith* (2014) 60 Cal.4th 603, 616–617.) As one treatise notes, the natural and probable consequences doctrine is a theory of liability that often exposes a defendant to punishment for "a crime of intent although his culpability regarding its commission may be no greater than that of negligence." (Dressler, Understanding Criminal Law (2d ed. 1995) § 30.05[B][5], p. 444.)

Murder, whether in the first or second degree, requires malice aforethought. (§ 187.) Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with "no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart" (§ 188, subd. (a)(2)). When a person directly perpetrates a killing, it is the perpetrator who must possess such malice. (See *People v. Concha* (2009) 47 Cal.4th 653, 660 ["To satisfy the mens rea element of murder, the defendant must personally act with malice aforethought."]; *People v. Soto* (2018) 4 Cal.5th 968, 974 (*Soto*) ["The mental component [of implied malice] is the

requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.' "].) Similarly, when a person directly aids and abets a murder, the aider and abettor must possess malice aforethought. (*McCoy*, *supra*, 25 Cal.4th at p. 1118 ["[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator."].) But until recently, when a person aided and abetted a nonhomicide crime that then resulted in a murder, the natural and probable consequences doctrine allowed him or her to be convicted of murder without personally possessing malice aforethought. So long as the direct perpetrator possessed malice, and the killing was a natural and probable consequence of the crime the defendant aided and abetted, it did not matter whether the defendant intended to kill or acted with conscious disregard for human life. (*Chiu*, *supra*, 59 Cal.4th at pp. 165–166.)

In *Chiu*, we held that the natural and probable consequences doctrine cannot support a conviction for first degree premeditated murder. (*Chiu*, *supra*, 59 Cal.4th at p. 167.) We reasoned that in the context of murder, the natural and probable consequences doctrine serves the purpose of "deterring aiders and abettors from aiding or encouraging the commission of offenses that would naturally, probably, and foreseeably result in an unlawful killing." (*Id*. at p. 165.) But this purpose "loses its force" when an accomplice is held culpable for first degree premeditated murder under a natural and probable consequences theory. (*Id*. at p. 166.) First degree premeditated murder carries significantly higher penalties than second degree murder and requires the additional mental state that the killing be "willful, deliberate, and premeditated."

(§ 189, subd. (a); *Chiu*, at p. 166.)  Whether or not the direct perpetrator killed with premeditation "has no effect on the resultant harm.  The victim has been killed regardless of the perpetrator's premeditative mental state." (*Chiu*, at p. 166.)

We further concluded that subjecting an accomplice to enhanced punishment based solely on the "uniquely subjective and personal" mental state of the direct perpetrator was inconsistent with "reasonable concepts of culpability."  (*Chiu*, *supra*, 59 Cal.4th at pp. 166, 165.)  We found "the connection between the defendant's culpability and the perpetrator's premeditative state . . . too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine."  (*Id*. at p. 166.)  By contrast, we concluded "that punishment for second degree murder is commensurate with" a defendant's level of culpability under the natural and probable consequences doctrine.  (*Ibid*.)  We thus left in place natural and probable consequences liability for second degree murder.

After *Chiu*, the Legislature in 2017 adopted Senate Concurrent Resolution No. 48, which declared the Legislature's intent to enact further "statutory changes to more equitably sentence offenders in accordance with their involvement in the crime."  (Sen. Conc. Res. No. 48, Stats. 2017 (2017–2018 Reg. Sess.) res. ch. 175 (Senate Concurrent Resolution 48).)  The resolution recognized a "need for additional reform when addressing aider and abettor liability . . . , specifically the 'natural and probable' consequences doctrine, which . . . results in greater punishment for lesser culpability."  (*Ibid*.)  The Legislature found that the natural and probable consequences doctrine "result[s] in individuals lacking the mens rea and culpability for murder being punished as if they were the ones

who committed the fatal act" and that "this leads to overbroad application." (*Ibid.*) It also concluded that "[i]t can be cruel and unusual punishment to not assess individual liability for nonperpetrators of the fatal act . . . and impute culpability for another's bad act, thereby imposing lengthy sentences that are disproportionate to the conduct in the underlying case." (*Ibid.*)

A year later, the Legislature cited Senate Concurrent Resolution 48 when it enacted Senate Bill 1437. (Stats. 2018, ch. 1015, § l, subd. (c) ["Senate Concurrent Resolution 48 . . . outlines the need for the statutory changes contained in this measure."].) Among other things, Senate Bill 1437 modified the requirement of malice aforethought for purposes of murder. Now, except for felony murder, "in order to be convicted of murder, a principal in a crime *shall act with malice aforethought*. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188(a)(3), italics added.)

The most natural meaning of this provision, construed in the context of Senate Bill 1437 as a whole and in the context of the Penal Code, bars a conviction for first or second degree murder under a natural and probable consequences theory. Except for felony murder, section 188(a)(3) makes personally possessing malice aforethought a necessary element of murder. Natural and probable consequences liability for murder contains no such requirement.

The language of section 188(a)(3) requires a principal to "act with malice aforethought" in order to be convicted of murder, making no exception for accomplices or second degree murder. (§ 188(a)(3).) By its terms, section 188(a)(3) permits a second degree murder conviction only if the prosecution can

prove the defendant acted with the accompanying mental state of mind of malice aforethought. The prosecution cannot "impute[] [malice] to a person based solely on his or her participation in a crime." (*Ibid.*)

Senate Bill 1437's legislative findings confirm this straightforward reading of the statute. The Legislature stated a need for "statutory changes to more equitably sentence offenders in accordance with their involvement in homicides." (Stats. 2018, ch. 1015, § l, subd. (b).) Accordingly, the Legislature found it "necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (*Id.*, § 1, subd. (f).) Critically, the Legislature said that with the exception of the felony murder rule, "[a] person's culpability for murder must be premised upon that person's *own actions and subjective mens rea.*" (*Id.*, § l, subd. (g), italics added.) These findings, like the text of the statute, clearly indicate that the Legislature intended to restrict culpability for murder outside the felony murder rule to persons who personally possess malice aforethought.

The natural and probable consequences doctrine is incompatible with this requirement because an aider and abettor need not personally possess malice, express or implied, to be convicted of second degree murder under a natural and probable consequences theory. (See *Chiu, supra,* 59 Cal.4th at p. 164 [" 'the mens rea of the aider and abettor with respect to [the nontarget] offense is irrelevant' "]; *People v. Culuko* (2000) 78 Cal.App.4th 307, 322 ["The natural and probable

consequences doctrine . . . allows an aider and abettor to be convicted of murder, without malice . . . ."].) Indeed, the natural and probable consequences doctrine authorizes precisely what Senate Bill 1437 forbids: it allows a factfinder to impute malice "to a person based solely on his or her participation in a crime." (§ 188(a)(3).) Under the doctrine, "individuals lacking the mens rea and culpability for murder [are] punished as if they were the ones who committed the fatal act." (Sen. Conc. Res. 48, *supra*.)

Further, we observe that in addition to amending the substantive law of murder, Senate Bill 1437 provided a procedure for defendants with eligible murder convictions to petition to have their convictions vacated through the trial court. (§ 1170.95.) This procedure expressly contemplates that defendants convicted of second degree murder can avail themselves of Senate Bill 1437's ameliorative provisions. Under section 1170.95, a defendant may petition to have his or her conviction vacated when, among other conditions, the following apply: "The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder" (§ 1170.95, subd. (a)(2)), and "[t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019" (§ 1170.95, subd. (a)(3)). If Senate Bill 1437 were inapplicable to second degree murder, there would have been no need to include second degree murder among the convictions eligible for relief under section 1170.95.

Apart from the Court of Appeal decision in this case, every published Court of Appeal opinion to address the issue has concluded that Senate Bill 1437 eliminates natural and probable consequences liability for murder regardless of degree.

(See, e.g., *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1102–1103 & fn. 9, review granted on another issue Nov. 13, 2019, S258175 (*Lopez*); *People v. Larios* (2019) 42 Cal.App.5th 956, 964, review granted Feb. 26, 2020, S259983; *People v. Verdugo* (2020) 44 Cal.App.5th 320, 323, review granted on another issue Mar. 18, 2020, S260493; *People v. Lewis* (2020) 43 Cal.App.5th 1128, 1135, review granted on another issue Mar. 18, 2020, S260598; *People v. Medrano* (2019) 42 Cal.App.5th 1001, 1007–1008, review granted on another issue Mar. 11, 2020, S259948; *People v. Lee* (2020) 49 Cal.App.5th 254, 262, review granted on another issue July 15, 2020, S262459; *People v. Offley* (2020) 48 Cal.App.5th 588, 595.)  We agree with these authorities.

## B.

The Court of Appeal here appeared to recognize that Senate Bill 1437 "intended to prohibit murder convictions where the participant was not the actual killer or a direct aider or abettor of the murderer." (*Gentile III*, *supra*, E069088.)  But it then misconstrued Gentile's argument by stating that "[c]ontrary to defendant's interpretation, section 189, subdivision (e) does not eliminate all murder liability for aiders and abettors." (*Ibid*.)  That was not Gentile's argument in the Court of Appeal or in this court.  Gentile has consistently argued that Senate Bill 1437 eliminated aiding and abetting murder liability under the natural and probable consequences theory, not that it eliminated all aiding and abetting murder liability.  Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought. (*McCoy*, *supra*, 25 Cal.4th at p. 1118.)

Nor is Gentile's argument based on section 189. He has consistently argued that section 188 eliminates natural and probable consequences liability for second degree murder. Section 189, subdivision (e) does not apply to this case; that provision addresses liability under the felony murder rule. The jury in Gentile's case was never instructed on the felony murder rule, and Gentile was not charged with a predicate felony that can serve as the basis for felony murder. (§ 189, subd. (a).) Nor does anyone argue that assault with a deadly weapon (§ 245, subd. (a)(1)) — the crime that Gentile is alleged to have aided and abetted — is a qualifying felony for felony murder purposes.

The Court of Appeal also reasoned that Gentile's contention would run counter to *Chiu*, which "made clear that second degree murder liability is proportional to the culpability of an aider and abettor under the natural and probable consequences doctrine." (*Gentile III*, *supra*, E069088.) But Senate Bill 1437 superseded that portion of *Chiu* by amending section 188 to require that a defendant personally possess malice aforethought to be convicted of murder, with only the exception of felony murder.

The San Diego County District Attorney (District Attorney) as amicus curiae argues that Senate Bill 1437 should be interpreted only to modify the natural and probable consequences doctrine for murder rather than to eliminate it. The District Attorney argues that what section 188(a)(3) does is add the element of malice aforethought to natural and probable consequences liability. In other words, the District Attorney contends that to be culpable for murder under the natural and probable consequences theory after Senate Bill 1437, a defendant must aid in and intend the commission of a target offense, the target offense must have foreseeably resulted in

murder, and additionally the defendant must possess malice aforethought. The District Attorney points to the fact that uncodified section 1, subdivision (f) of Senate Bill 1437 uses the word "amend." (*Id.*, § 1, subd. (f) ["It is necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."].)

But it is not unreasonable to say that Senate Bill 1437 "amend[ed] . . . the natural and probable consequences doctrine, as it relates to murder," by eliminating the doctrine's applicability to murder while leaving the doctrine intact with respect to other crimes. (*Id.*, § 1, subd. (f).) In any event, an uncodified statement of purpose cannot substitute for operative statutory language (see *Scher v. Burke* (2017) 3 Cal.5th 136, 148–149; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 58–61). By limiting murder liability to those principals who personally acted with malice aforethought, section 188(a)(3) eliminates what was the core feature of natural and probable consequences murder liability: the absence of a requirement that the defendant personally possess malice aforethought. As a result, the most natural reading of Senate Bill 1437's operative language is that it eliminates natural and probable consequences liability for first and second degree murder. Further, we agree with the Attorney General that the District Attorney's proposed "hybrid doctrine" is "confusing and unnecessary" and is most likely not what the Legislature intended.

The District Attorney points to two unpublished cases to illustrate the importance of creating a "hybrid doctrine." In one case, the driver in a drive-by shooting was convicted of second degree murder after he "observed rival gang members on [his gang's] 'turf' " and "drove up to the rivals at a rapid speed to scare them" as well as "beat them up and harm them," at which point his companion suddenly opened fire and caused the death of one of the rival gang members. (*People v. Franco* (Dec. 10, 2012, D060354) [nonpub. opn.].) In the other case, three gang members were convicted of second degree murder for ambushing and stabbing to death a person walking home, but the evidence was inconclusive as to which of the defendants actually caused the death of the victim. (*People v. Dean* (Sept. 30, 2020, D074371) [nonpub. opn.].) Without a "hybrid doctrine," the District Attorney contends, these defendants would have "literally g[otten] away with murder."

As the Attorney General observes, however, second degree murder in both cases might have been pursued under a direct aiding and abetting theory. Such a theory requires that "the aider and abettor . . . know and share the murderous intent of the actual perpetrator." (*McCoy, supra*, 25 Cal.4th at p. 1118). For implied malice, the intent requirement is satisfied by proof that the actual perpetrator " 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.' " (*Soto, supra*, 4 Cal.5th at p. 974.) Therefore, notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.

In other cases involving conduct resulting in a victim's death, a murder prosecution can proceed under the "substantial factor" causation doctrine or the felony murder rule. (See, e.g., *People v. Jennings* (2010) 50 Cal.4th 616, 643; *People v. Chun* (2009) 45 Cal.4th 1172, 1182.) Moreover, the foreseeable result of a defendant's actions, though insufficient by itself to result in liability for murder, remains relevant to assessing whether the defendant acted with malice aforethought or whether the defendant's actions were sufficiently connected to the victim's death as a matter of proximate cause.

Even if the "hybrid doctrine" might theoretically reach some conduct not reached by the doctrines above, the universe of such conduct — where there is proof of malice aforethought but insufficient evidence of direct aiding and abetting or other liability for murder — seems ill-defined and, in any event, quite narrow. We are not persuaded that the Legislature intended to preserve natural and probable consequences liability for murder through a "hybrid doctrine" that would apply to a vague and, in all likelihood, very small set of cases. In addition, the District Attorney's proposed jury instructions for the "hybrid doctrine" would unnecessarily complicate an already complicated body of law. As the Attorney General explains, the core feature of the natural and probable consequences doctrine is that it eliminates the mental state requirement for the nontarget crime — here, eliminating the malice requirement for murder. To instruct a jury on the natural and probable consequences doctrine, the essence of which is that malice is not required, and then ask the jury to assess whether the defendant acted with malice, would pose a substantial risk of confusion. This further suggests that the Legislature did not intend to adopt a "hybrid doctrine," and we decline to do so judicially.

In sum, we hold that section 188(a)(3) bars conviction for second degree murder under a natural and probable consequences theory.

## III.

When a trial court instructs the jury on alternative theories of guilt and at least one of those theories is legally erroneous at the time it was given, we normally assess whether the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.) We "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*Ibid.*)

Here, Senate Bill 1437 did not become effective until after Gentile's conviction. (§ 1170.95, subd. (a)(3) ["changes to Section 188 [and] 189 [are] made effective January 1, 2019"].) As a result, whether Gentile may obtain relief in this direct appeal depends on whether the ameliorative provisions of Senate Bill 1437 apply retroactively to cases not yet final on appeal. Gentile argues that under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), the amendments Senate Bill 1437 made to sections 188 and 189 should apply retroactively to cases on direct review. The Attorney General contends that the text and structure of Senate Bill 1437 make clear that while its ameliorative provisions apply retroactively, defendants may seek relief only by filing a section 1170.95 petition in superior court. The Courts of Appeal have uniformly agreed with the Attorney General's view. (*Lopez, supra,* 38 Cal.App.5th at pp. 1113–1114, rev. granted on another issue; *People v.*

*Munoz* (2019) 39 Cal.App.5th 738, 751–753, review granted on another issue Nov. 26, 2019, S258234; *People v. Martinez* (2019) 31 Cal.App.5th 719, 727–729 (*Martinez*); *People v. Cervantes* (2020) 46 Cal.App.5th 213, 220–221 (*Cervantes*); *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147–1158; *People v. Bell* (2020) 48 Cal.App.5th 1, 10–11.) We do as well: The ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95.

Newly enacted legislation lessening criminal punishment or reducing criminal liability presumptively applies to all cases not yet final on appeal at the time of the legislation's effective date. (See *Estrada, supra,* 63 Cal.2d at pp. 744–745.) This presumption "rests on an inference that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not." (*People v. Conley* (2016) 63 Cal.4th 646, 657 (*Conley*); see *People v. Frahs* (2020) 9 Cal.5th 618, 628–629; *Estrada,* at p. 745.)

However, when ameliorative legislation sets out a specific mechanism as the exclusive avenue for retroactive relief, we have held that such legislation does not apply retroactively to nonfinal judgments on direct appeal. (See *Conley, supra,* 63 Cal.4th at pp. 656–659; *People v. DeHoyos* (2018) 4 Cal.5th 594, 602–603 (*DeHoyos*).) In *Conley,* we concluded that Proposition 36, the Three Strikes Reform Act of 2012, did not apply retroactively to defendants whose convictions were not yet final on appeal based on three "interpretive considerations."

(*Conley*, at p. 657.)  First, Proposition 36 established a specific mechanism for defendants to seek resentencing in light of its ameliorative provisions, and that mechanism "dr[ew] no distinction between persons serving final sentences and those serving nonfinal sentences."  (*Ibid.*)  Second, Proposition 36 did not make resentencing automatic; its provisions directed the trial court to evaluate whether early release would pose "an 'unreasonable risk of danger to public safety' " based on the defendant's criminal history and other factors.  (*Id.* at p. 658.) Third, we explained that other complexities in the law — including the fact that it created a new set of sentencing factors that must be pleaded and proved by the prosecution and did not specify how the prosecution would meet that burden in a case where the defendant was already sentenced — indicated that "voters intended for previously sentenced defendants to seek relief" solely through a resentencing petition as provided by the initiative.  (*Id.* at p. 661; *id.* at pp. 659–660.)

In *DeHoyos*, we held that Proposition 47, the Safe Neighborhoods and Schools Act, did not apply retroactively to cases on direct review.  (*DeHoyos*, *supra*, 4 Cal.5th at p. 603.) Proposition 47 contained a specific mechanism for resentencing that did not draw a distinction between persons serving final and nonfinal sentences.  (*Ibid.*)  And Proposition 47 did not automatically entitle defendants to relief; it required the trial court to assess whether early release would pose a risk to public safety.  (*Ibid.*)  Finally, although Proposition 47 did not create new sentencing factors that must be pleaded and proved by the prosecution, "other indicia of legislative intent" — including the breadth of the statement of purpose in the Voter Information Guide — indicated that the voters intended to extend relief to

all defendants who had not yet completed their sentences, subject to the law's resentencing mechanism. (*Ibid.*)

Similarly here, Senate Bill 1437 creates a specific mechanism for retroactive application of its ameliorative provisions. Section 1170.95 lays out a process for a person convicted of felony murder or murder under a natural and probable consequences theory to seek vacatur of his or her conviction and resentencing. First, the person must file a petition with the trial court that sentenced the petitioner declaring, among other things, that the petitioner "could not be convicted of first or second degree murder because of changes to Section 188 or 189." (§ 1170.95, subd. (a)(3); see § 1170.95, subd. (b)(1)(A).) Then, the trial court must "review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of th[e] section." (§ 1170.95, subd. (c).) If so, the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts. (§ 1170.95, subds. (c), (d)(1).) At the hearing, the prosecution must "prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) "The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Ibid.*) We express no view here on the questions regarding the section 1170.95 process that are before us in *People v. Lewis* (2020) 43 Cal. App. 5th 1128, review granted Mar. 18, 2020, S260598.

Two considerations lead us to conclude that the Legislature intended section 1170.95 to be the exclusive avenue for retroactive relief under Senate Bill 1437. First, the Legislature crafted a specific mechanism for seeking retroactive

relief, and that mechanism does not distinguish between persons whose sentences are final and those whose sentences are not. "That the Legislature specifically created this mechanism, which facially applies to both final and nonfinal convictions, is a significant indication that Senate Bill 1437 should not be applied retroactively to nonfinal convictions on direct appeal." (*Martinez, supra,* 31 Cal.App.5th at p. 727.)

Second, section 1170.95 by its terms does not automatically provide all defendants with a right to relief. Instead, it requires the sentencing court to assess the defendant's eligibility for and entitlement to relief through a petition and hearing process in which the prosecution and the petitioner "may rely on the record of conviction *or offer new or additional evidence* to meet their respective burdens." (§ 1170.95, subd. (d)(3), italics added; see § 1170.95, subds. (a), (c).) The fact that Senate Bill 1437 provides the parties "with the opportunity to go beyond the original record in the petition process, a step unavailable on direct appeal, is strong evidence the Legislature intended for persons seeking the ameliorative benefits of Senate Bill 1437 to proceed via the petitioning procedure." (*Martinez, supra,* 31 Cal.App.5th at p. 728.) We express no view on the circumstances in which new or additional evidence may result in the denial of relief to a defendant who has made a prima facie showing under section 1170.95. We simply observe that the Legislature, while intending to provide relief to defendants whose convictions do not reflect their individual culpability, also allowed for the possibility that some convictions that implicate the ameliorative provisions of Senate Bill 1437 may nonetheless remain valid.

The Office of the State Public Defender as amicus curiae contends that because Senate Bill 1437 completely abolished

murder liability on a natural and probable consequences theory, the applicable precedent on retroactivity is not *Conley* or *DeHoyos* but *People v. Rossi* (1976) 18 Cal.3d 295. Rossi was convicted of violating former section 288a, which criminalized all acts of oral copulation. Before her conviction became final, the Legislature amended section 288a in a manner that legalized her conduct. We reversed the conviction, stating that the *Estrada* rule applies not only when new legislation reduces punishment for a crime, but also "when criminal sanctions have been completely repealed before a criminal conviction becomes final." (*Rossi*, at p. 301.) But *Rossi* did not involve ameliorative legislation that contained express provisions for obtaining retroactive relief. It is true that Senate Bill 1437, unlike the statutes considered in *Conley* and *DeHoyos*, went beyond reducing punishment for particular crimes and altogether eliminated a theory of liability for murder. But it did so in a manner that expressly provides a mechanism for retroactive relief. In light of this feature, *Rossi* is inapt, and *Conley* and *DeHoyos* are more analogous to this case.

The Office of the State Public Defender also contends that the word "may" instead of "shall" in the first sentence of section 1170.95 indicates that the Legislature did not intend the section 1170.95 petition process to be an exclusive remedy. But the resentencing schemes we considered in *Conley* and *DeHoyos* also used "may" instead of "shall." (See *Conley*, *supra*, 63 Cal.4th at p. 655; *DeHoyos*, *supra*, 4 Cal.5th at p. 598.) By authorizing defendants to petition for relief, the word "may" in section 1170.95 does not suggest that relief on direct review is also available.

Gentile makes several arguments for the availability of relief on direct appeal, but none is persuasive. First, he argues

that *Conley* and *DeHoyos* are distinguishable because Senate Bill 1437, unlike Proposition 36 and Proposition 47, does not mandate a separate inquiry into dangerousness or impose any other discretionary requirement for retroactive relief. That is true, but section 1170.95 requires the superior court to determine on an individualized basis, after considering any new or additional evidence offered by the parties, whether the defendant is entitled to relief. This suggests the Legislature's intent to limit retroactive relief to the procedures in section 1170.95.

Second, Gentile contends that the Legislature included section 1170.95 in order to "grant a form of super-retroactivity, over and above the retroactivity that the law would ordinarily provide, in order to extend the benefit of *Estrada* to those with final judgments" rather than seeking to "deny the benefit of *Estrada* to those with nonfinal judgments." But nothing in the statute's text or legislative history supports this assertion. The Legislature enacted Senate Bill 1437 several months after our decision in *DeHoyos* and more than two years after *Conley*. Both cases had construed a resentencing mechanism that "dr[ew] no distinction between persons serving final sentences and those serving nonfinal sentences" to apply to both categories of persons. (*Conley, supra,* 63 Cal.4th at p. 657; see *DeHoyos, supra,* 4 Cal.5th at p. 603.) Against this backdrop, if the Legislature had intended section 1170.95 to apply only to defendants whose convictions had become final, we would expect the Legislature to have clearly said so.

Third, Gentile argues that section 1170.95, subdivision (f) — which says, "This section does not diminish or abrogate any rights or remedies otherwise available to the petitioner" — suggests the petition process was not intended to be an exclusive

mechanism for relief. But there is "no indication that reversal of a defendant's sentence on direct appeal without compliance with the procedures outlined in section 1170.95 was among the 'rights' the Legislature sought to preserve in enacting Senate Bill 1437." (*Martinez, supra,* 31 Cal.App.5th at p. 729; see *Cervantes, supra,* 46 Cal.App.5th at pp. 224–225.) We rejected similar arguments with regard to Proposition 36 (see *Conley, supra,* 63 Cal.4th at pp. 661–662) and Proposition 47 (see *DeHoyos, supra,* 4 Cal.5th at pp. 605–606), and we reject Gentile's argument here as well.

Fourth, Gentile says the Legislature included section 1170.95 in order to level the playing field for defendants with final convictions, since the typical remedy for a defendant with a nonfinal conviction would be reversal and remand for a new trial where new or additional evidence can be offered. This argument also finds no support in the statute's text or legislative history. As the Attorney General observes, Gentile's argument cannot be reconciled with the fact that allowing defendants to obtain automatic relief on direct appeal would "strip the prosecution of its statutorily granted right to introduce new or additional evidence to defend the continuing validity of the conviction" during the section 1170.95 process.

Fifth, Gentile contends that the Legislature crafted the section 1170.95 petition process to "avoid unfairness . . . to parties who may not have previously litigated an issue that was not relevant but now is." He gives the example of a prosecutor who opted not to introduce evidence that the defendant acted with implied malice and was guilty of second degree murder because the prosecutor was pursuing a felony murder theory that did not require a showing of malice aforethought. We agree that the Legislature authorized the parties to offer new or

additional evidence during the section 1170.95 process in order to allow the parties to explore issues they did not explore under the prior state of the law. The statute contemplates that such evidence may inform whether a conviction remains valid despite the ameliorative provisions of Senate Bill 1437. But this aspect of the statute does not suggest that the Legislature intended to allow defendants to obtain relief from nonfinal judgments on direct review. Instead, it suggests the opposite.

Sixth, Gentile argues that because "*Chiu* applies to cases not yet final on direct appeal, it would be illogical to conclude the further and analogous change in the law effectuated by the amendment to Penal Code sections 188 and 189 does not." We see nothing illogical here. *Chiu*'s applicability to nonfinal judgments does not make it unreasonable for the Legislature to require defendants to proceed under section 1170.95 in order to obtain relief on a claim not governed by *Chiu*.

Apart from his statutory arguments, Gentile says that section 1170.95, as applied to a nonfinal conviction, violates the Sixth Amendment to the United States Constitution because it allows a judge rather than a jury to "redetermine an inmate's guilt under the revised homicide statutes." He relies on *People v. Ramos* (2016) 244 Cal.App.4th 99. Ramos was convicted by a jury of unlawful transportation of heroin under a statute that prohibited any transportation of certain controlled substances. (*Id.* at pp. 100, 102.) Before Ramos's conviction became final, new legislation limited criminal liability to transportation of the enumerated controlled substances "for sale." (*Id.* at pp. 102–103.) The Court of Appeal held that because these changes were "retroactive" and applied to Ramos, and because a jury "did not determine whether the heroin she transported was for sale rather than personal use," her conviction had to be reversed.

(*Id.* at p. 103.) But *Ramos* is not squarely on point because the ameliorative change was retroactive to cases on direct review. (*Id.* at p. 103 ["Defendant contends, the People concede, and we agree, the amendment is retroactive" on direct appeal and "applies to defendant."].) Here, we have determined that Senate Bill 1437's ameliorative changes to sections 188 and 189 are not retroactive to cases on direct review. This reasoning also rebuts the argument, raised by the California Attorneys for Criminal Justice, that Gentile's instructional error argument must be addressed on direct review.

The crux of Gentile's argument is that the section 1170.95 process violates the principle that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490; see *Alleyne v. United States* (2013) 570 U.S. 99, 103.) In *People v. Perez* (2018) 4 Cal.5th 1055 (*Perez*), the defendant similarly argued that Proposition 36 entitled eligible defendants to ameliorative relief and that any factual finding by the trial court resulting in the denial of relief was a finding that effectively increased his sentence in violation of *Apprendi*. (*Perez*, at p. 1064.) We disagreed, explaining that "Proposition 36 does not automatically reduce, recall, or vacate any sentence by operation of law." (*Ibid.*) "It is up to the inmate to petition for recall of the sentence, and at all times prior to the trial court's resentencing determination, the petitioner's original . . . sentence remains in effect. Under this scheme, a factual finding that results in resentencing ineligibility does not increase the petitioner's sentence; it simply leaves the original sentence intact." (*Ibid.*)

Gentile argues *Perez* is distinguishable on two grounds: it involved a final conviction, not a nonfinal one as here; and the finding at issue in *Perez* did not concern a fact essential to the validity of the underlying conviction or the original sentence when imposed, insofar as Proposition 36 merely reduced the punishment for particular third strike convictions without disturbing the validity of those convictions. (*Perez*, *supra*, 4 Cal.5th at p. 1064.) But this issue is not presented in this direct appeal. Gentile has not filed a petition for resentencing under section 1170.95, nor do we have before us a section 1170.95 proceeding in which the trial court relied on facts not found by a jury to sustain an otherwise invalid conviction. Accordingly, we have no occasion here to opine on whether denial of a section 1170.95 petition on the basis of such factual findings would run afoul of *Apprendi*.

Further, Gentile contends that requiring defendants to pursue relief exclusively through section 1170.95 violates the appellate jurisdiction clause of the California Constitution by "cut[ting] off a significant limb of the Court of Appeal and this Court's appellate jurisdiction and bestow[ing] it onto the superior court." (See Cal. Const., art. VI, § 11, subd. (a) [with the exception of death penalty cases, the Courts of Appeal have appellate jurisdiction in virtually all cases where the superior courts had original jurisdiction, as well as in other cases when prescribed by statute].) As a matter of constitutional avoidance, he says, we should construe the revisions to sections 188 and 189 as applying retroactively to cases not yet final on appeal. The amicus brief of the California Attorneys for Criminal Justice echoes this argument.

But nothing in the language of the appellate jurisdiction clause "conveys an intention to grant litigants a right of direct

appeal from judgments in proceedings within the superior courts' original jurisdiction." (*Leone v. Medical Board* (2000) 22 Cal.4th 660, 666.) " 'Giving the words their ordinary meaning, the provision serves to establish and allocate judicial authority, not to define or guarantee the rights of litigants. Indeed, the provision nowhere mentions direct appeals or a "right of appeal." ' " (*Ibid.*) It is true that "[b]ecause the appellate jurisdiction clause is a grant of judicial authority, the Legislature may not restrict appellate review in a manner that would ' "substantially impair the constitutional powers of the courts, or practically defeat their exercise." ' " (*Id.* at p. 668.) But Senate Bill 1437 does not cause any such impairment. Although Gentile may not obtain relief from his sentence under the ameliorative provisions of Senate Bill 1437 on direct review, he may still exercise his right under section 1237 to appeal his felony conviction on other available grounds. And if the superior court holds that Gentile is not entitled to relief under section 1170.95, he may appeal that ruling. Because Senate Bill 1437 does not bar appellate review of Gentile's claim for relief, it does not violate the appellate jurisdiction clause of the California Constitution.

Finally, the Office of the State Public Defender argues that our reading of Senate Bill 1437 will lead to unnecessary delay if defendants await resolution of their direct appeals before filing a section 1170.95 petition. But nothing prevents defendants from seeking to stay their direct appeals in order to pursue relief under Senate Bill 1437. While a notice of appeal vests exclusive jurisdiction in the appellate court "until determination of the appeal and issuance of the remittitur" (*People v. Perez* (1979) 23 Cal.3d 545, 554), a defendant may nevertheless file a motion in the appellate court requesting a

stay of the appeal and a limited remand for the purpose of pursuing section 1170.95 relief. An appellate court may grant such a stay and limited remand where good cause supports the motion. (See *Martinez, supra,* 31 Cal.App.5th at p. 729; *Cervantes, supra,* 46 Cal.App.5th at p. 226; see also *People v. Awad* (2015) 238 Cal.App.4th 215, 220 [appellate courts may "issue a limited remand to the trial court, before reaching the merits of the appeal, for the specific purpose of allowing the lower court to entertain a . . . petition to recall a sentence" under Proposition 47].) "In those cases where a stay is granted and a section 1170.95 petition is successful, the direct appeal may either be fully or partially moot. If the petition is unsuccessful, a defendant may seek to augment the appellate record, as necessary, to proceed with any issues that remain for decision." (*Martinez*, at p. 729.)

In sum, we conclude that the ameliorative provisions of Senate Bill 1437 do not automatically apply to nonfinal judgments on direct appeal. Gentile must proceed under section 1170.95 in order to obtain relief from his second degree murder conviction.

## IV.

In *Gentile I*, the Court of Appeal observed that the superior court "instructed the jury at length that it could convict defendant of first degree murder" under a natural and probable consequences theory. (*Gentile I, supra,* E064822.) The court said "[t]he fact the jury did not find that the defendant used a deadly or dangerous weapon in the commission of the offense supports an inference that the jury convicted him on [a natural and probable consequences] theory" instead of viewing him as the direct perpetrator of the crime. (*Ibid.*) Indeed, the Attorney

General's briefing in *Gentile I* conceded that there was "no basis in th[e] record to conclude beyond a reasonable doubt that the jury ultimately rested its verdict on the theory that [Gentile] directly aided and abetted" the murder. Noting "the pathologist's determination that it would be difficult to cause the victim's fractured clavicle and the rib below it with the fists alone," and relying on the Attorney General's concession that the record does not permit a conclusion that the jury's first degree murder verdict was based on a valid ground, the Court of Appeal concluded it was "probable that the jury convicted defendant on an unauthorized legal theory." (*Ibid.*)

Yet in the decision below, the Court of Appeal reached a different conclusion. "[A]fter reviewing the record," it concluded that Gentile "was a direct or active aider and abettor" of murder, and that "no resort to the natural and probable consequences theory applies." (*Gentile III, supra,* E069088.) Given the Attorney General's prior concessions and the fact that section 1170.95 permits the parties to offer "new or additional evidence" in a resentencing proceeding, the Court of Appeal was poorly positioned on direct review to conclude that "defendant was, at a minimum, an active aider-abettor who is not entitled to vacation of his murder conviction." (*Gentile III, supra,* E069088.) In light of these considerations, that conclusion has no preclusive effect if Gentile files a petition for relief from his murder conviction under section 1170.95.

Going forward, the parties agree that Gentile has made "a prima facie showing that he . . . is entitled to relief" (§ 1170.95, subd. (c)) in light of the Attorney General's concessions and the Court of Appeal's determination in *Gentile I* that it is "probable" the jury relied on a natural and probable consequences theory in finding him guilty of murder. In their section 1170.95

briefing, the parties are free to litigate what bearing, if any, doctrines of estoppel or preclusion may have in light of those prior concessions and the Court of Appeal's determination in *Gentile I.*

## CONCLUSION

The judgment of the Court of Appeal is reversed. The matter is remanded to that court to affirm Gentile's second degree murder conviction without prejudice to any petition for relief that Gentile may file under section 1170.95.

**LIU, J**.

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**GRIMES, J.**[*]

---

[*]     Associate Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Gentile

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 35 Cal.App.5th 932
**Rehearing Granted**

_____

**Opinion No.** S256698
**Date Filed:** December 17, 2020

_____

**Court:** Superior
**County:** Riverside
**Judge:** Graham A. Cribbs

_____

**Counsel:**

Eric R. Larson, under appointment by the Supreme Court, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland, Assistant Attorney General, Charles Ragland, Lynne McGinnis, James H. Flaherty III, A. Natasha Cortina, Meredith S. White and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

Mitchell Keiter for Amicus Populi as Amicus Curiae.

Summer Stephan, District Attorney (San Diego), Mark A. Amador, Linh Lam and Michael Runyon, Deputy District Attorneys for San Diego Country District Attorney as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Eric R. Larson
330 J Street, #609
San Diego, CA 92101
(619) 238-5575

Alan L. Amann
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 645-2277