Filed 10/12/21  P. v. Williams CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OCTAVUS VASHON WILLIAMS,<br><br>    Defendant and Appellant. | D078714<br><br>(Super. Ct. No. SCD207315) |


APPEAL from an order of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Adrian R. Contreras, Deputy Attorneys General, for Plaintiff and Respondent.

In 2008, a jury convicted Octavus Vanshon Williams of second degree murder (Pen. Code,[1] § 187, subd. (a)) and found the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). Williams was sentenced to an indeterminate term of 15 years to life in prison. Williams appealed, and this court affirmed the judgment in an unpublished opinion, *People v. Williams*, D054769 (Sept. 21, 2010).[2]

In 2019, Williams filed a petition for resentencing under section 1170.95.

The trial court appointed counsel, received briefing, reviewed the record of conviction, and heard argument. The court denied the petition, finding Williams was prosecuted as a direct aider and abettor and that the jury was not instructed on felony murder for second degree murder and the jury was not instructed on the natural and probable consequences doctrine for that offense.

Williams filed a timely notice of appeal.

STATEMENT OF FACTS

We include the facts of the offense as they were stated in our previous opinion in this case.[3] (*People v. Williams*, *supra*, D054769.)

"On January 24, 2007, Williams, [A.] Brown, [K.] Johnson, [T.] Morris, and [G.] Harper gathered with other members and associates of the O'Farrell Park gang at an apartment on 63rd Street in San Diego.

---

[1]    All further statutory references are to the Penal Code.

[2]    At respondent's request, we granted judicial notice of our records in case No. D054769.

[3]    We do so in nearly verbatim fashion except to sometimes use last names and/or initials in naming third parties involved in the subject offenses to protect privacy as much as possible.

"Williams, called "Big Homey" by Harper, was a shot-caller; he had the highest status among members of the O'Farrell Park gang. Brown was also a senior member of the gang. Younger members such as Harper, Jones, and Johnson were called the O'Farrell Park Banksters and were lower in the hierarchy. Morris had been documented as a member of the Skyline criminal street gang, which was much larger than the O'Farrell Park gang, but he frequented the O'Farrell Park gang territory. The O'Farrell Park gang was 'tight' with the Skyline gang and the two gangs 'r[a]n together.'

"Detective Joseph Castillo, the prosecution's gang expert, testified that snitching is a major violation of a gang's unwritten rules. In addition, younger gang members like Harper were supposed to 'kick up' money to older members such as Williams and Brown. They were expected to help older gang members if asked. The younger gang members could be disciplined or 'checked' if they failed to do so. Detective Castillo opined that checking, which ranges from a tongue lashing to a beating, assists the gang by letting other members know there are repercussions for behavior that violates the gang's code. He acknowledged that a beating is not necessarily designed to kill the offending gang member.

"Sometime before the killing, Williams complained to Jones that he had done favors for Harper, but Harper had 'just looked over him like it was nothing.' Harper's girlfriend, [L.C.], testified that Harper received several cell phone calls from Williams in December and January before Harper disappeared. She did not know whether Williams asked Harper for money or to borrow a gun. Harper had money because he had a job and was selling marijuana.

"Harper drove to the apartment in a white Dodge Magnum. . . . Williams followed Harper into the kitchen. While Williams was getting

marijuana from Harper, Williams demanded, 'Why didn't you answer your phone?' Brown walked into the kitchen and either he or Williams asked Harper, 'What are you doing bringing this faggot shit into the neighborhood, fucking with faggots?' Harper responded, 'That's bullshit. What are you talking about? . . . You got me fucked up. Fucking with some guys? Are you fucking crazy?' Williams and Brown also demanded money from Harper. Williams and Harper began fighting, eventually moving into the living room. At that point, when the fight was one-on-one, Harper was able to fight back. Brown picked up Harper's 'weed' and money from the floor. As the fight continued, Williams and Brown worked together to attack Harper, telling him not to come back to the neighborhood. When Brown hit Harper in the face, Harper fell into the entertainment system, knocking over the television. Harper called out for Jones to help him.

"Jones joined his girlfriend, [A.T.], in Jones's bedroom. One of them turned up the volume of the television. [A.T.] still heard Harper screaming and yelling 'like a girl.' Morris entered Jones's bedroom and asked him why he did not intervene to stop his 'Hommies' from tearing up the living room. Jones, who was very upset, yelled from the bedroom doorway that everyone had to get out. He did not open the door fully because he did not want to risk harm to himself or [A.T.]. At one point during the fight, Brown came into Jones's bedroom and asked Morris if he had a 'whop,' meaning a gun; Morris said he did not.

"Morris left shortly afterwards and saw that Williams and Brown had cornered Harper in the living room. Harper was alive and dressed, Williams was trying to stop his nose from bleeding, and Morris thought everyone had given up on the fight. He testified he did not intervene, because 'I didn't have no beef with none of these dudes.'

4

"When things quieted down, Jones looked out of the bedroom through a crack in the door. He saw Brown in what he described as an 'aggressive' stance, like he was thinking, 'What the hell am I going to do next?' Jones and [A.T.] stayed in the bedroom for what could have been 15 minutes longer before they entered the living room. Johnson was the only person left in the room.

"Later that afternoon, Williams and Brown returned to the apartment in a white van. Jones refused to let Brown inside. Brown dropped $200 on the ground and said that if he had broken anything, the money would take care of it.

"Harper's sister, [A.] Taylor, contacted media outlets the next day to report Harper missing. She had learned that his girlfriend, [L.C.], had not heard from Harper since the day before. Taylor posted her brother's picture and a description of his car on MySpace.com. [L.C.] filed a missing person's report with the police. Harper's body was found in the trunk of the Dodge Magnum on January 26, 2007, clothed only in boxer shorts and socks. The medical examiner determined that Harper died of strangulation.

"Investigators collected evidence from the Dodge Magnum, including a bunched up shirt that appeared to have been used to wipe something down. The shirt had Harper's blood near the logo and Williams's DNA on the inside of the collar. A palm print found on the rear bumper belonged to Williams.

"Williams and Brown were both charged with Harper's murder, but the court ordered separate trials with Williams tried first. Jones, Morris, [L.C.], Johnson and [A.T.] testified that they and their families had been threatened with retaliation because of their appearances at trial. Jones testified the accusation that Harper was gay was 'obviously bullshit.' He had never heard rumors that Harper was gay. Johnson said it seemed like Williams and

5

Brown were checking Harper.  He testified that the purpose of checking was 'to get somebody's attention . . . not necessarily to kill them.' "

## DISCUSSION

Williams contends the trial court erred in summarily denying his petition without first issuing an order to show cause (OSC).  He argues the court engaged in factfinding.  We will find the trial court properly reviewed the record of conviction from which the court could find Williams was not eligible for relief under section 1170.95.

### A.  Legal Principles

The question of whether the court properly reviewed the record of conviction in determining Williams was not eligible for relief is one of law, which we will review de novo.  (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437) was enacted to " 'amend[ ] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 842.)

Section 1170.95, subdivision (c) provides:  "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section.  If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served.  These deadlines shall be extended for good

6

cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

When a trial court reviews a petition for resentencing, the court first determines if the petitioner has shown a prima facie case for relief under the statute. If so, the court must issue an OSC and hold an evidentiary hearing on the petition. (*People v. Lewis* (2021) 11 Cal.5th 952, 962 (*Lewis*).) However, the court may deny the petition if the person is ineligible as a matter of law. (*People v. Drayton* (2020) 47 Cal.App.5th 965, 980-981.) The court may review the record of conviction, including any prior appellate opinion, to determine if the petitioner's allegations are rebutted by the record. (*Lewis*, at p. 972.) However, the court may not engage in factfinding and weighing credibility at the prima facie stage of petition review. (*Drayton*, at p. 979.)

When a petition is filed under section 1170.95 the petitioner must present a prima facie case for relief. Alleging the conviction was based on grounds now made impermissible under Senate Bill 1437 will show a prima facie case for relief. Absent anything to change the showing, the court should issue an OSC and conduct an appropriate evidentiary hearing.

Our Supreme Court recently determined that after appointment of counsel, the court can consider the record of conviction, as well as any appellate opinion involved in the record. The limitation on such review is the trial court may not engage in factfinding. The court reasoned the prima facie showing of the petition could be rebutted by the record. (*Lewis*, *supra*, 11 Cal.5th at pp. 970-971.) The court said: " 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Id*. at p. 971.) "Appellate

opinions . . . are generally considered to be part of the record of conviction." (*Id*. at p. 972.) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Ibid*.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1170.95], subdivision (c)." (*Ibid*.)

The court noted that examining the file, including jury instructions given at the trial did not constitute prohibited factfinding. Such material can rebut the prima facie showing in the petition without the necessity of an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at p. 971.)

### B. Analysis

Williams contends the court should not have considered the record of conviction and should not have used the record to rebut his contentions in his petitions. Williams does not argue the court's interpretation of the record, the jury instructions, and this court's opinion as to the nature of the prosecution's presentation was wrong. His argument is the court should not have conducted such review at the prima facie stage of the petition review. Williams's position on appeal is understandable because his opening brief was filed before our Supreme Court filed its *Lewis* opinion. It is now clear the trial court correctly considered the record of conviction.

The jury instructions demonstrated Williams was tried as a direct aider and abettor who acted with implied malice. Although there was a first degree murder instruction given on felony murder, the jury acquitted him of first degree murder. No instruction was given on second degree felony murder nor was there an instruction for second degree murder liability under the doctrine of natural and probable consequences arising from an underlying

8

felony.  The prosecution's case for second degree murder was based on implied malice from the beating Williams inflicted on the victim.

The trial court properly determined Williams was not convicted on any of the impermissible theories of murder liability in Senate Bill 1437 (Stats. 2018, ch. 1015).  The court properly found Williams is not eligible for resentencing.

DISPOSITION

The order denying Williams's petition for resentencing under section 1170.95 is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:


HALLER, J.


GUERRERO, J.

9