Filed 5/13/22  P. v. Cernogg CA2/3

Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B303218 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA085192) |
| v. | |
| JAMES RUSSELL CERNOGG, JR., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Reversed and remanded with directions.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Amanda V. Lopez and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Appellant James Russell Cernogg appeals from a postjudgment order denying his Penal Code section 1170.95 petition.[1]  In his earlier appeal of the trial court's order, we reversed and remanded for further proceedings.  Our Supreme Court granted review, and has now transferred the matter back to us with directions to vacate our prior decision and reconsider the cause in light of Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775).  We do so, and again reverse and remand.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *The murder and Cernogg's conviction*[2]

On May 11, 2006, 12-year old Camilo H. and 15-year old Michael Pimental were "tagging" in the area of Rosecrans and Poinsettia Avenues in Compton.  Camilo wrote his moniker, "Dust," on a wall.  Cernogg, who was an associate of the Elm Street Piru gang, was riding his bicycle in the area and asked the youths why they were writing on the wall.  Camilo said, " 'My bad.' "  Cernogg told the boys to come with him, and they complied.  As they walked down Rosecrans, Cernogg spoke with another person on the phone and said, " 'I got them right [here.]' "  The person on the phone told him to hold the boys there.  Cernogg said to Camilo, " 'I'm going to kill you and your mom.' "

Meanwhile, Michael M., a friend of the boys, approached and asked Pimental if he had seen his mother.  Pimental asked Michael M. to accompany them.  Cernogg asked Michael M. if he

---

[1]      All further undesignated statutory references are to the Penal Code.

[2]      We derive the factual and procedural background in part from our prior opinions in this matter, of which we take judicial notice.  (Evid. Code, §§ 451, 452, 459.)

wanted " 'some problems, too' " and said " '[y]ou better go back.' "
According to Michael M.'s trial testimony, Cernogg pulled up his
shirt to reveal a gun in his waistband.[3]  Cernogg said, " 'I'm going
to teach these little fools a lesson not to write in my hood again.' "

Within a few minutes, codefendant Jeffrey Martin, an Elm
Street Piru gang member, arrived at the scene.  He held a gun,
covered with a rag.  Without saying a word to anyone, Martin
pointed the gun at Pimental, who pleaded, " 'No, don't shoot.' "
From a distance of no more than three feet away, Martin fired a
single shot into Pimental's head, killing him.  Cernogg ran away,
leaving his bicycle at the scene; Martin walked away in the same
direction.

Cernogg was charged with murder.  At trial, the People
proceeded under two theories of guilt:  that Cernogg directly
aided and abetted the murder, and that the murder was the
natural and probable consequence of the target crime, felony false
imprisonment.  The jury was instructed on both theories.
(CALJIC Nos. 3.01, 3.02.)  It convicted Cernogg of first degree
murder (§ 187, subd. (a)) and additionally found gang and firearm
enhancements true.  (§§ 186.22, subd. (b), 12022.53, subds. (b),
(c), (d), & (e)(1).)  The trial court sentenced Cernogg to 25 years to
life in prison for the murder, plus 25 years to life for the firearm
enhancement.

---

[3]      At trial, Michael M. did not identify Cernogg as the man on
the bicycle.  Prior to trial, he did not tell detectives that the man
on the bicycle displayed a gun.

## 2. *Prior direct appeals*

In a 2009 opinion, a different panel of this Division affirmed Cernogg's judgment. (*People v. Cernogg* (Dec. 9, 2009, B210684) [nonpub. opn.] (*Cernogg I*).) *Cernogg I* rejected claims that the evidence was insufficient, the trial court committed instructional and sentencing errors, and the sentence amounted to cruel and unusual punishment. *Cernogg I* concluded the evidence was sufficient to support both theories advanced by the People, i.e., direct aiding and abetting and the natural and probable consequences doctrine. After describing the evidence supporting the conclusion that Cernogg was a direct aider and abettor, *Cernogg I* held, "This evidence is more than sufficient to show that Cernogg shared Martin's intent and purpose; hence, he is liable as a direct aider and abettor of Pimental's murder." Turning to the sufficiency of the evidence to support the conviction under the natural and probable consequences doctrine, *Cernogg I* continued: "Alternatively, it is also possible that Cernogg did not know that Martin intended to execute Pimental. Perhaps, as Cernogg suggests in his opening brief, he thought Martin would merely give the young boys a 'stern warning.' Even so, there is still evidence to support the judgment under the natural and probable consequences doctrine."

In 2014, our Supreme Court concluded, in *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), that an aider and abettor cannot be guilty of first degree premeditated murder under the natural and probable consequences doctrine. (*Id.* at pp. 158–159.) In April 2015, we granted Cernogg's motion to recall the remittitur and reinstate the appeal, based on *Chiu*. In an opinion issued on September 3, 2015, we concluded that under *Chiu*, the trial court had erred by instructing the jury on the natural and probable

4

consequences doctrine.  (*People v. Cernogg* (Sept. 3, 2015, B210684) [nonpub. opn.] (*Cernogg II*).)  We determined that remand was required for either a new trial, or to allow the People to accept a reduction of the offense to second degree murder.  We reasoned:  "Where, as here, a defendant possibly has been convicted of first degree premeditated murder under the natural and probable consequences doctrine, the conviction must be reversed unless the reviewing court can conclude beyond a reasonable doubt that the jury based its verdict on a legally valid theory.  [Citations.]  A legally valid theory—direct aiding and abetting—was before the jury.  But, as the People concede, we cannot determine beyond a reasonable doubt that the jury based its verdict on that theory, as opposed to the invalid natural and probable consequences doctrine.  The People argued both theories to the jury and nothing in the record suggests on which theory the jury relied."  We further explained that the evidence was sufficient to prove Cernogg acted as a direct aider and abettor.

On remand, the People elected not to retry Cernogg for first degree murder.  His conviction was reduced to second degree murder, and the trial court resentenced him to 15 years to life for the murder, plus 25 years to life for the firearm enhancement.

3.  *Cernogg's section 1170.95 petition and appeal*

In January 2019, after passage of Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), Cernogg filed a petition to vacate his second degree murder conviction.  Using a preprinted form, he stated that he had been convicted of murder pursuant to the felony-murder rule or the natural and probable consequences doctrine; he was not the actual killer; and he could not now be convicted of murder in light of changes to the law

made by Senate Bill 1437.  He also requested the appointment of counsel.

The trial court determined that Cernogg had established a prima facie case, appointed counsel for him, and considered the parties' briefs.  The People argued that the record of conviction was sufficient to prove Cernogg acted as a direct aider and abettor with the intent to kill, and therefore he was not entitled to relief under section 1170.95.  Cernogg argued the trial evidence did not show he had the intent to kill.  Further, he argued the question was not whether substantial evidence supported denial of the petition.  Instead, the court had to apply the "beyond a reasonable doubt" standard.

On November 21, 2019, the trial court denied the petition after considering the court file and this court's prior opinions in the case.  It explained, "I find to be the law of this case and I do find that [section] 1170.95 is not applicable to Mr. Cernogg, specifically 1170.95(a)(3) in that the findings of the appellate court and my findings with the appellate court decision is that their malice was present in regards to an intent to kill on a direct aiding-and-abetting theory beyond a reasonable doubt."

Cernogg appealed, and we reversed.  (*People v. Cernogg* (Mar. 12, 2021, B303218) [nonpub. opn.] (*Cernogg III*.)  We concluded that the proper inquiry for a court ruling on a section 1170.95 petition after a subdivision (d) hearing is not whether there was substantial evidence in the record to support a murder verdict.  Instead, the court must act as an independent trier of fact and determine whether the evidence presented by the parties establishes beyond a reasonable doubt that the petitioner is guilty of murder under a still-valid theory.  Because we could not discern whether the trial court applied the correct standard, we

6

reversed and remanded to allow the court to conduct a new hearing at which it would act as the trier of fact, determine whether the prosecution established all elements of second degree murder on a still-viable theory, and state its findings on the record.

Both the People and Cernogg appealed, and our Supreme Court granted both petitions pending disposition of *People v. Duke*, S265309.

After passage of Senate Bill 775, the Supreme Court transferred the matter back to us with directions to vacate our decision and reconsider the cause in light of Senate Bill 775. We have vacated our prior decision and have considered the parties' supplemental briefs, and again reverse and remand for a new section 1170.95 hearing.

## DISCUSSION

1. *Senate Bills 1437 and 775*

Senate Bill 1437 limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder. (*People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.) To achieve these goals, Senate Bill 1437 added section 189, subdivision (e) (limiting application of the felony-murder rule) and section 188, subdivision (a)(3) (stating that " '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' ") (*Gentile*, at pp. 842–843.) Senate Bill 1437 also added section 1170.95, which created a procedure whereby persons convicted of murder under a now-invalid felony-murder or natural and probable consequences theory may petition for vacation of their convictions and resentencing. If the petitioner makes a prima facie case for relief,

7

the trial court must issue an order to show cause (OSC) and, absent a stipulation by the parties, hold a hearing to determine whether to vacate the conviction. (§ 1170.95, subds. (c), (d).)

After the trial court's ruling and this court's 2021 opinion, Senate Bill 775 changed or clarified the law in several respects. As originally enacted, section 1170.95, subdivision (d)(3) stated that the prosecution had to prove a petitioner's ineligibility for relief beyond a reasonable doubt. The appellate courts disagreed regarding the meaning of this language. Some held that the People had to prove only that there was substantial evidence a petitioner could still be convicted of murder, while others concluded that the trial court had to act as an independent fact finder and determine whether the evidence established beyond a reasonable doubt that the petitioner was guilty of murder under amended sections 188 and 189.[4] In our 2021 opinion, we adopted the latter view. Thereafter, Senate Bill 775 amended section 1170.95 to expressly provide that the substantial evidence standard does not apply at a section 1170.95, subdivision (d) hearing. The law now states: "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).)

Senate Bill 775 also specified what evidence might be considered at such a hearing. Section 1170.95, subdivision (d)(3) now states, in pertinent part: "The admission of evidence in the

---

[4] Our Supreme Court granted review on the question in *People v. Duke*, S265309, but transferred *Duke* back to the appellate court after passage of Senate Bill 775.

hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion.  However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule.  The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens."

Additionally, Senate Bill 775 added subdivision (g) to section 1170.95.  That subdivision provides, "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437."  Subdivision (g) supersedes *Gentile*'s holding that Senate Bill 1437's ameliorative provisions do not apply on direct appeal.  (See *People v. Gentile*, *supra*, 10 Cal.5th at p. 839.)

Under *In re Estrada* (1965) 63 Cal.2d 740, we assume that, absent contrary evidence, an amendment reducing punishment for a crime applies retroactively to all nonfinal judgments.  (*Id.* at pp. 745–746; *People v. Brown* (2012) 54 Cal.4th 314, 323; see *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.)  Such is the case with Senate Bill 775.  (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1006–1007; *People v. Porter* (2022) 73 Cal.App.5th 644, 652.)  For retroactivity purposes, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed.  (*People v. Vieira*

9

(2005) 35 Cal.4th 264, 306.) Cernogg's appeal of the denial of his section 1170.95 petition was not final when Senate Bill 775 took effect, and therefore the amendments apply retroactively to consideration of his petition.

2. *Remand is required for a new section 1170.95, subdivision (d) hearing*

Although the trial court did not issue an OSC, the parties have treated its denial of the petition as a decision on the merits following an evidentiary hearing under section 1170.95, subdivision (d)(3). Cernogg does not contend the court's failure to issue an OSC was error or somehow prejudiced him. Accordingly, we treat the court's ruling as a denial of the petition under subdivision (d).

As noted, in our 2021 unpublished opinion we agreed with Cernogg that the proper inquiry for a court ruling on a section 1170.95 petition at the subdivision (d)(3) hearing stage is not whether there is substantial evidence in the record to support a murder verdict on a still-valid ground. Instead, the court must act as an independent fact finder and determine whether, beyond a reasonable doubt, the petitioner is guilty under a theory that remains valid after Senate Bill 1437's enactment. Congruent with our holding in *Cernogg III*, the Legislature has now expressly stated that the substantial evidence standard does not apply.

As we previously explained, it is not clear from the record that the trial court employed the correct, independent fact finder standard. It stated it had considered the court file as well as this court's prior opinions, and it discussed the evidence presented at trial. It also referenced the reasonable doubt standard. But, the record also suggested the court felt bound by the law of the case

10

doctrine, and denied the petition because this court had already held, in *Cernogg I* and *Cernogg II*, that substantial evidence existed to support a jury finding that Cernogg was guilty as an aider and abettor.  The trial court referenced its own findings, but only in conjunction with the "findings of the appellate court." When Cernogg's counsel asked the court to specify the basis for its decision, it responded that "the findings by the appellate court are such that there is *more than sufficient evidence* to find beyond a reasonable doubt the defendant guilty under the aiding-and-abetting theory and that's based on the appellate court's finding it appears that's what the jury did."  (Italics added.)  When counsel argued that the substantial evidence test did not apply, the court again referenced the law of the case doctrine.  Had the court been acting as an independent fact finder, there would have been no reason for it to discuss the law of the case doctrine. Moreover, Senate Bill 775 has now clarified what type of evidence is admissible at the section 1170.95, subdivision (d) hearing. Given the foregoing, we again reverse the trial court's order and remand to allow it to conduct a new hearing in accordance with section 1170.95, as amended by Senate Bill 775.

3. *Alternative-theory error analysis is inapplicable to evaluation of a section 1170.95 petition and Cernogg is not entitled to a new jury trial*

Cernogg argues that he is entitled to a new jury trial.  He also argues that his petition must be evaluated using the alternative-theory error analysis applicable on direct review, which, he contends, requires reversal of his murder conviction. He is incorrect on both points.

" 'The retroactive relief provided by section 1170.95 reflects an act of lenity by the Legislature "that does not implicate

11

defendants' Sixth Amendment rights." ' [Citations.]" *People v. Silva* (2021) 72 Cal.App.5th 505, 520.) Thus, a "petitioner is not entitled to a jury trial at any point in the section 1170.95 process. Indeed, courts have uniformly held that section 1170.95 does not implicate the Sixth Amendment right to a jury trial." (*People v. Farfan* (2021) 71 Cal.App.5th 942, 948; *Silva*, at p. 520; *People v. James* (2021) 63 Cal.App.5th 604, 608–609; *People v. Howard* (2020) 50 Cal.App.5th 727, 740; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156.) Senate Bill 775 did nothing to change this principle.

Cernogg's contention that the superior court was required to apply an alternative-theory instructional error analysis when ruling on his petition fares no better. When a trial court instructs a jury on two theories, one legally correct and the other legally incorrect, on direct appeal reversal is required unless the reviewing court finds, beyond a reasonable doubt, that the jury based its verdict on a valid ground. (*People v. Gentile*, *supra*, 10 Cal.5th at p. 851; *People v. Aledamat* (2019) 8 Cal.5th 1, 13; *People v. Chiu*, *supra*, 59 Cal.4th at p. 167; *In re Martinez* (2017) 3 Cal.5th 1216, 1218; *People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.) The relevant question in such a case is "not whether we believe it clear beyond a reasonable doubt that the defendant is guilty under the legally correct theory, but whether we can say, beyond a reasonable doubt, that the legally incorrect jury instruction did not taint the actual jury verdict." (*People v. Baratang* (2020) 56 Cal.App.5th 252, 263.)

In his original briefing, Cernogg argued that this same standard applies to evaluation of a section 1170.95 petition; "Proving *ineligibility* beyond a reasonable doubt is simply another way of saying that the instructional error in the first

12

instance was 'harmless beyond a reasonable doubt.' " Thus, he argued, because this court had already held it was not possible to determine beyond a reasonable doubt whether the jury relied upon the natural and probable consequences doctrine, his conviction must be vacated. Senate Bill 775, he contends, reinforces the validity of his arguments, especially in light of the addition of subdivision (g) (stating that application of Senate Bill 1437 may be considered on direct appeal).

But this is not a direct appeal, and the alternative-theory error analysis has no relevance here. (See *People v. Farfan*, *supra*, 71 Cal.App.5th at p. 947 ["The mere filing of a section 1170.95 petition does not afford the petitioner a new opportunity to raise claims of trial error . . . ."].) The fact it cannot be determined which theory the jury relied upon means Cernogg is not *ineligible* for section 1170.95 relief as a matter of law. It does not mean he is *necessarily* entitled to relief after a section 1170.95, subdivision (d) hearing. The Legislature has specified in section 1170.95 a specific and detailed procedure to provide relief to persons with final convictions, i.e., that where a petitioner has made a prima facie case, the trial court must evaluate the evidence, act as a fact finder, and determine if the petitioner is guilty of murder based on a still-valid theory. Basing a reversal upon instructional error that occurred at the original trial is inconsistent with section 1170.95 and has no place in this process. Moreover, the fact that a petitioner might have been convicted on a natural and probable consequences or felony-murder theory is a given; if it were not so, the petitioner would be ineligible for relief as a matter of law. Under Cernogg's theory, any such petitioner would be entitled to reversal or a new trial automatically, without the need for a section 1170.95, subdivision

13

(d) hearing. This does not comport with the procedure mandated by the Legislature.

Senate Bill 775's addition of subdivision (g) has no bearing on Cernogg's petition. Subdivision (g) states that a person whose *conviction* "is not final may challenge on *direct appeal* the validity of that conviction." (Italics added.) Cernogg's murder conviction was final years ago, and the appeal of the denial of his section 1170.95 petition is not a direct appeal.

Cernogg's equal protection argument also fails to persuade. We understand Cernogg's argument to be that equal protection principles require he be treated identically to persons whose convictions are not final. This, he theorizes, requires application of the alternative-theory error standard, reversal of his murder conviction, and a new jury trial.

"The concept of equal treatment under the laws means that persons similarly situated regarding the legitimate purpose of the law should receive like treatment. [Citation.] ' "The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged." ' " (*People v. Morales* (2016) 63 Cal.4th 399, 408.)

Even where two groups are similarly situated, unless a suspect class is involved, equal protection is denied only when there is no rational relationship between the disparity of treatment and some legitimate governmental purpose. Contrary to Cernogg's assertion, rational basis review applies here. (See *People v. Sanchez* (2020) 48 Cal.App.5th 914, 921 [rational basis

review applies to evaluation of Senate Bill 1437]; *People v. Mora* (2013) 214 Cal.App.4th 1477, 1483 [if "the classification does not involve a suspect class, legislation is presumed to be valid under the equal protection clause if the statutory classification is rationally related to a legitimate state interest."]; *People v. Cruz* (2012) 207 Cal.App.4th 664, 676, fn. 11 ["prisoners are not a suspect class; status of incarceration is neither an immutable characteristic nor an invidious basis of classification"]; *People v. Yearwood* (2013) 213 Cal.App.4th 161, 178–179.)

Cernogg fails to establish the first prerequisite for an equal protection claim, i.e., that he is similarly situated to persons whose direct appeal is still pending. But even assuming for purposes of argument that he is similarly situated, no equal protection violation is apparent.

A statute providing for reduction of sentences " 'only prospectively from the date a new sentencing statute takes effect is not a denial of equal protection.' " (*People v. Floyd* (2003) 31 Cal.4th 179, 189.) The " 'ability to elect to be sentenced under a law enacted after the date of the commission of a crime is not a constitutional right but a benefit conferred solely by statute. It is not unconstitutional for the legislature to confer such benefit only prospectively . . . .' " (*Id.* at pp. 189–190; see *People v. Smith* (2015) 234 Cal.App.4th 1460, 1467.) The " '14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time.' [Citation.]" (*Floyd*, at p. 191.)

If a new statute providing for lesser punishment can constitutionally be made completely prospective, then certainly the Legislature may constitutionally require that persons whose convictions are final may obtain relief based on an ameliorative

15

statute, but only through specified means. Here, the Legislature has reasonably provided different mechanisms for relief for persons whose judgments are not final, and those whose are. The former may seek application of Senate Bill 1437's changes on direct appeal; the latter may obtain relief via the section 1170.95 petition procedure. Both approaches provide for application of Senate Bill 1437's amendments, and for full relief: if an instructional error is deemed prejudicial on direct appeal, the appellant will likely get a new trial; if a section 1170.95 petition is granted, his or her murder conviction will be vacated. Cernogg fails to show how application of the section 1170.95 procedure meaningfully disadvantages him.

Moreover, the Legislature's use of these different procedures is reasonable and rationally related to legitimate governmental purposes. The Legislature could have wished to avoid an onslaught of full jury retrials which likely would have overwhelmed the trial courts, instead opting for the more economical and relatively more expeditious section 1170.95 procedure. (See generally *People v. Floyd*, *supra*, 31 Cal.4th at p. 191 [recognizing as "legitimate the practical concerns associated with the transition from one sentencing scheme to another, such as resentencings"]; *People v. Cruz*, *supra*, 207 Cal.App.4th at p. 679.) Additionally, nonfinal cases are typically of more recent vintage than final judgments. If an instructional error requires retrial after reversal on direct appeal, it is more likely witnesses and evidence will still be readily available. In the case of final convictions—often many years old—it is much less likely witnesses or evidence will still be accessible. Mandating new jury trials would require that the People expend considerable resources to find such witnesses or prove their

unavailability (see Evid. Code, § 1291). And, where witnesses are available, requiring them to testify a second time would certainly inconvenience and potentially traumatize them. The section 1170.95 procedure mitigates such concerns by making an exception to the hearsay rules, expressly stating that "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law." (§ 1170.95, subd. (d)(3).) Conversely, as to non-final convictions, the Legislature could reasonably conclude that allowing a Senate Bill 1437 claim in the direct appeal is both efficient and expeditious, in that all claims may be adjudicated in a unitary proceeding. That option, of course, is not possible where the conviction is already final.[5]

---

[5] Cernogg asserts that Senate Bill 775 requires that at the section 1170.95, subdivision (d) hearing, "evidentiary constraints," including "all federal and state constitutional parameters existent at the time of its enactment" and "judicial interpretations of same" must apply, including the rule of *Crawford v. Washington* (2004) 541 U.S. 36. He also asserts that the trial court may not consider any prior appellate opinion except in regard to the procedural history of the case. As no hearing has yet been held under section 1170.95 as amended by Senate Bill 775, no evidentiary rulings yet exist. We have no occasion to consider Cernogg's broad assertions in a vacuum, except to note that the Sixth Amendment, and therefore *Crawford*, does not apply at a section 1170.95 evidentiary hearing. (See *People v. Silva*, *supra*, 72 Cal.App.5th at p. 520; *People v. James*, *supra*, 63 Cal.App.5th at p. 610; *People v. Anthony*, *supra*, 32 Cal.App.5th at p. 1156.)

## DISPOSITION

The order is reversed. The matter is remanded for further proceedings in accordance with section 1170.95, as amended by Senate Bill 775, and with the opinions expressed herein.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.