Filed 10/25/22 P. v. Gonzalez CA3
Opinion following rehearing

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C086562 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF-16-4909) |
| v. | OPINION ON REHEARING |
| JUSTIN MATTHEW GONZALEZ et al., | |
| Defendants and Appellants. | |

A jury convicted defendants Justin Matthew Gonzalez and Alexis Ivan Velazquez of the murder of Ronald Antonio.[1]  Gonzalez and Velazquez, who belonged to the Varrio Bosque Norteño gang (also known as VBN), evidently mistook Antonio for a rival gang member.  Gonzalez held Antonio and Velazquez stabbed him.

---

[1]  The defendants' briefs refer to the victim as Ronald Antonio Fontanilla. Witnesses at trial, including the victim's sister, refer to him as Ronald Antonio, as do we.

The jury found Gonzalez guilty of second degree murder (Pen. Code, § 187, subd. (a)—count 1)[2] and Velazquez guilty of first degree murder. (§§ 187, subd. (a), 189— count 1.) The jury also found Gonzalez guilty of criminal street gang activity (§ 186.22, subd. (a)—count 2), and found true the allegation that he murdered Antonio for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) In Velazquez's case, the jury convicted him of criminal street gang activity (§ 186.22, subd. (a)—count 2) and found that he personally used a dangerous or deadly weapon to kill Antonio (§ 12022, subd. (b)(1)), he was an active participant in a criminal street gang (§ 186.22, subd. (b)(1)), and the special circumstance that he committed the murder for the benefit of the gang. (§§ 186.22, subd. (f), 190.2, subd. (a)(22).) Gonzalez was sentenced to 70 years to life plus 20 years for two prior convictions. Velazquez was sentenced to life without parole.

Gonzalez contends that Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), which eliminated the natural and probable consequences doctrine as it relates to murder, is retroactive to his case and requires reversal of his murder conviction. In supplemental briefing, Gonzalez further asserts that Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775) also applies retroactively and permits him to raise the elimination of the natural and probable consequences doctrine on direct appeal. The Attorney General concedes Senate Bill 1437 and Senate Bill 775 apply retroactively, but argues that based on the record, Gonzalez is not entitled to reversal. We disagree. Therefore, we reverse Gonzalez's conviction for second degree murder.

Velazquez contends that the trial court erred in responding to the jury's question regarding the meaning of the phrase "knowing the consequences" in CALCRIM No. 521, the pattern instruction on first degree murder. We find no error in the court's answer,

---

[2] Undesignated statutory references are to the Penal Code.

which was appropriately based on *People v. Cordero* (1989) 216 Cal.App.3d 275, 282 (*Cordero*).

We granted petitions for rehearing filed by Gonzalez and Velazquez contending that the amendments to section 186.22 made by Assembly Bill No. 333 (Stats. 2021, ch. 699, § 3) (Assembly Bill 333), effective January 1, 2022, require reversal of the gang participation convictions and vacation of the gang enhancements, including the gang-murder special circumstance. We agree that Assembly Bill 333 applies to this case, and under the statutory amendments made by the bill, the gang counts must be reversed and the gang enhancements and special circumstance vacated.[3]

## FACTUAL BACKGROUND

On August 30, 2016, Y.C., a former Norteño gang member, was living in the Casa del Sol mobile home park. When he was active in the Norteño gang, he had heard the term "Scrap" used as a disrespectful reference to the rival Sureño gang. He identified Gonzalez (known to him as "Bandit") and Velazquez (known as "Oso") in court as two men he frequently saw in the unit next door where two women lived. Around 8:30 p.m. on August 30, Gonzalez, with Velazquez, came up to Y.C. and asked him if he was a Scrap and "if I bang." He understood that Norteños used the question, "Do you bang?" to determine if an individual is associated with the Sureño gang. Velazquez also said the word "Bosque." Y.C. knew that if he did not confirm that he was an active Norteño— that is, if he was a dropout from the gang or a Sureño—his response could lead to violence. He told Gonzalez and Velazquez that he did not bang. The women from next door grabbed Gonzalez and Velazquez and told them to leave Y.C. alone.

Aaron Moe, a gang investigator from the Yolo County District Attorney's Office, explained that Varrio Bosque Norteño or VBN is a Norteño-affiliated street gang in

---

[3] This matter was reassigned to the panel as presently constituted in June 2022.

Woodland, California. VBN claims control of Woodland. Based on his review of the evidence in the case, Investigator Moe testified that on August 30, 2016, Gonzalez and Velazquez were active members of VBN.

Investigator Moe testified that "hood checking" involves a gang member confronting individuals not known to the area or the gang and determining their gang association by looking at tattoos or clothing or by their responses to questions. Active VBN members hood check people in Woodland. A confrontation can turn violent if the individual answers to being a Sureño.

Around 10:30 p.m. on August 30, 2016, Marco A., a resident of Casa del Sol and a former Norteño, had come home from work and was walking his dog. He was confronted by two Hispanic men. Marco told them he did not want any problems. He tried to back up but they kept coming forward and pushing against him. One of them was trying to calm the other. Marco was wearing his blue work uniform. Blue is the color associated with the Sureño gang. The men were asking him who he was and where he was from. He assumed they were gang members and were asking about gang association because of his blue clothes. Marco had a knife and pulled it out. The blade flipped out on its own and he put it away, continuing to say that he did not want problems. When the men kept backing him up, Marco took off and went home.

That evening Pedro M. was talking to Antonio outside Pedro's unit at Casa del Sol. The two men left to walk to a nearby bar around 10:00 p.m. to play a game of pool. Just before they got to the trailer park office, a car pulled up and some women got out screaming. One of them was bleeding. Pedro told Antonio to keep on walking. The women stopped screaming and got in the car to leave. One of the women said she wanted to borrow Pedro's shirt but he refused and kept on walking. The woman stopped Antonio and he gave her his shirt to stop the bleeding. Pedro kept walking. When he turned around, he did not see anyone. He turned back towards his house but heard screaming and a lot of running and yelling. He decided to walk to his house, keeping his head

4

down. When he got to the house, Antonio was lying by the front doorsteps and his stepdaughter Sara D. was calling 911.

Earlier Sara, who was visiting her mother at Casa del Sol, had heard people screaming. She asked her mother where Pedro was, looked out the living room window, and saw some people and a man with an eight- to ten-inch knife. The man had long hair and a beard and was wearing a white shirt. Sara heard a knock on the door but was afraid to open it. She waited "a little bit" and then opened it. She saw Antonio lying on the stairs bleeding. He could not talk. She knew he was dying because his breathing was labored. She saw a lot of blood. Antonio was not wearing a shirt. She called 911.

Sara looked around and saw people running. Some minutes passed and a tall, thin White girl with red and orange hair came up. Sara asked the girl if she saw anything, if she knew who did it. The girl said, "Oh, my God, I can't believe they did this." When she asked the girl again if the girl knew who did it, the girl said, "Yes, El Oso."

Isaiah M. was living in Casa del Sol on August 30, 2016. That night he heard two Latina women arguing in his front yard. After they left, he went outside to take out the trash, saw Antonio and Pedro passing by, and greeted them. Then he heard screaming, walked around the corner, and saw Antonio taking off his shirt and giving it to a woman. The woman wrapped up her arm with it. Isaiah saw blood on her shirt and arm. He walked over and asked if she needed help or wanted him to call an ambulance. He saw that she was cut from the right elbow to the forearm, about three to four inches, and bleeding a lot. She was using Antonio's shirt to stop the bleeding. The woman said, "Is that him?" Isaiah asked again if she needed him to call an ambulance or the police, and she said, "No. You did this to me . . . you fucking Scrap." He knew that the word "Scrap" was a derogatory term that a Norteño used for a Sureño. He had heard the word before though he was never in a gang. He asked what she was talking about. She opened a little, one-inch-blade knife and kicked him three times in the leg.

5

Isaiah turned and ran.  He saw Antonio watching at the corner.  Antonio said, "Don't hurt me."  Isaiah told Antonio that he did not do anything and should go hide in his house.  Antonio started running.  Isaiah saw two Hispanic men running from the entrance of the park towards him, one wearing a white shirt and one wearing a black shirt, both with short hair.  One of them yelled, "Bosque," which he had heard before in reference to a Norteño gang.  He ran to his father-in-law's trailer and called 911.

Raquel P. lived at Casa del Sol on August 30, 2016.  She saw Antonio, her neighbor, get stabbed that night.

Raquel saw two young men, neighbors who lived up the street, coming towards her when she left her trailer to check her mail at approximately 9:45 p.m.  She also saw two women in a white van arguing.  One of them was driving and the other was outside the van yelling, "No.  Nina.  Don't go.  Don't go."  A third woman—who looked "American," with strange hair that could have been a wig—came up, pointed in Antonio's direction, and yelled to the two men, "Come here.  This is where the piece of shit is at."  The men ran in the direction she was pointing.

One of the men had a knife.  He had long hair and a beard.  The knife was long with a white handle.  The other man was clean-shaven, thin and taller than the man with the weapon.  Both men were wearing blue pants and white T-shirts.

Raquel testified that Antonio was trying to get to his house but the men stopped him.  The man with long hair had the weapon in his hand.  The other man wrapped his arms around Antonio from behind.  Antonio tried to get away but there were two people attacking him.  The man with the knife grabbed Antonio by the hand and stabbed him twice.  The men let go of Antonio, he fell down, and they ran off.  Antonio tried to get up and walk.  He crawled to his neighbor's house, knocked on the door, and fell backwards onto a wooden bench.

Raquel stood still with her head lowered because she was afraid.  The men ran past her and were gone when she turned her head.  Five minutes later, the American woman

6

came up and saw Antonio bleeding on the ground. She said, "Oh, my fucking God. The fucking Oso did. He really did."

The police brought out four males for Raquel to view at the scene. She identified a young man with long hair as the man who stabbed Antonio. The man she described as the stabber was Velazquez. She identified that man in court as Velazquez.

At the scene, Raquel could not identify Gonzalez as the man with Velazquez. The next day she could not identify Gonzalez in a photo lineup. At trial, she did identify Gonzalez as the person who held Antonio while Velazquez stabbed him.

On August 30, 2016, at approximately 11:00 p.m., Cristian H. was in his car with friends in front of his home at Casa del Sol. He saw a man chasing Antonio. Both men fell down and got up again. He got out of his car and was standing in front of his house. Cristian heard Antonio screaming something like, "Oh, don't" or "No, don't do it." Antonio put his hands out, palms in front of him. Cristian saw the other man pull something from his waist and it looked as if he was stabbing Antonio. When Cristian went to where the men were, he saw a trail of blood and the body of Antonio. The man stabbing Antonio was tall and had long hair.

Ruby Aradoz attended most of the trial as a codefendant. On December 1, 2017, Aradoz entered into an agreement to plead guilty to being an accessory after the fact to a felony. (§ 32.) The prosecutor agreed to dismiss that charge if Aradoz provided truthful testimony and cooperated with the prosecution.

Aradoz testified she had been drinking vodka before going to Casa del Sol on August 30, 2016, and was very intoxicated. A lot of things were blacked out and a blur to her. She could remember parts of that night and testified to the parts she remembered.[4]

---

[4] For example, Aradoz could not remember contact with Isaiah or her calling him a "Scrap," but she did not deny it occurred. She had blacked out. Aradoz heard Isaiah testify that she had a knife. She testified it was possible but unlikely.

7

On August 30, Aradoz went to Casa del Sol in a car with some friends between 9:00 and 10:00 p.m. to get food at the trailer of a friend. After they parked the car, her friends went on foot to the trailer and Aradoz stayed in the car.

Aradoz remembered being in the parking lot for a while. She remembered talking to a Hispanic man on a bicycle. When he left, Aradoz noticed she was bleeding from a four- to five-inch laceration on her right arm. She did not know the man or remember their conversation.

She approached two men and asked for help. She asked if they knew what happened to her or who did it. She asked one of the men for his shirt to stop the bleeding and he gave it to her.

Aradoz walked away from the men, wrapping her arm in the shirt. Then there was a commotion. She saw a man she knew as Oso turning the corner and running down the street. Her middle name is Morning Feather. He pointed at her and said, "Feather," more as a question. She ran in the same direction. Gonzalez was running behind Velazquez and Aradoz's friend was running as well.[5]

Next, Aradoz remembered Velazquez and Gonzalez having a physical altercation with a person who she later found out was Antonio. It seemed like a fistfight but she did not see any punches thrown. Antonio was on the ground and the two men were on top of him on their knees. Aradoz then saw Velazquez standing over Antonio with a big kitchen knife. Aradoz walked away with her friend.

Gonzalez approached Aradoz and her friend. He was cursing. He had a knife in his hand. It was a kitchen knife that was as long as the knife Velazquez had, but not as wide. Aradoz's friend told Gonzalez to leave them alone. Gonzalez walked back to Velazquez.

---

[5] Aradoz's friend, Amanda Heflin, who Aradoz knew as Amanda Herrera, could not be located by police.

Aradoz did not see the knives until after the altercation with Antonio. Aradoz did not see either attacker stab Antonio. Aradoz and her friend walked back to her car and went to UC Davis Medical Center.

Aradoz identified Velazquez and Gonzalez in court as the men who attacked Antonio.

Antonio was 41 when he was murdered. He had grown up in Casa del Sol. Antonio had been working at Big O Tires for seven or eight years at the time of his death. He was living with and caring for his elderly father, who could no longer care for himself. Antonio was Filipino, born in the Philippines. He had never been in a gang.

## DISCUSSION

### I

*Gonzalez's Contention*

*Senate Bill 1437 and Senate Bill 775*

Gonzalez contends that his second degree murder conviction should be reversed because Senate Bill 1437 amended sections 188 and 189 to eliminate the natural and probable consequences doctrine for second degree murder, under which he contends he was convicted.

As summarized by the California Supreme Court in *People v. Gentile* (2020) 10 Cal.5th 830, superseded by statute on other grounds as stated in *People v. Hola* (2022) 77 Cal.App.5th 362, 370 (*Gentile*): "Senate Bill 1437 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § l, subd. (f).)" (*Gentile, supra*, at p. 842.)

9

"[T]o amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) . . . : 'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.'

". . . Senate Bill 1437 added section 1170.95 [now section 1172.6]**6** to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above." (*Gentile, supra*, 10 Cal.5th at pp. 842-843.)

The court concluded that "section 188[, subdivision] (a)(3) bars conviction for second degree murder under a natural and probable consequences theory." (*Gentile, supra*, 10 Cal.5th at p. 851.)

Senate Bill 1437 did not become effective until after Gonzalez was convicted. In such a case, the *Gentile* court held that "[t]he ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Gentile, supra*, 10 Cal.5th at pp. 851-852.)

We granted Gonzalez's request for supplemental briefing for the parties to address the effect of Senate Bill 775 (Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022), which was enacted in part to overrule *Gentile*. As stated in an Assembly Report: "In *Gentile*, the California Supreme Court found that the petition process set forth in [] section 1170.95 is the exclusive remedy for retroactive [Senate Bill] 1437 relief on nonfinal judgments. ([] *Gentile, supra*, 10 Cal.5th at pp. 851-859.) Generally, the rule is that a judgment is not

---

**6**    Effective June 30, 2022, former section 1170.95 was recodified without substantive change as 1172.6.  (Stats. 2022, ch. 58, § 10.)

final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed. (*People v. Vieira* (2005) 35 Cal.4th 264, 306, quoting *People v. Nasalga* (1996) 12 Cal.4th 784, 789, fn. 5.) [¶] This bill would provide that where a conviction is not final, it may be challenged on [Senate Bill] 1437 grounds on direct appeal from that conviction." (Assem. Com. on Public Safety, Rep. on Sen. Bill 775 (Reg. Sess. 2021-2022) July 13, 2021, p. 11.)

Senate Bill 775 added subdivision (g) to former section 1170.95: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 (Chapter 1015 of the Statutes of 2018)."

Here, the trial court instructed the jury with CALCRIM No. 403 that Gonzalez could be convicted of second degree murder under a theory of natural and probable consequences if the jury decided he was guilty of assault by means of force likely to produce great bodily injury. In rebuttal closing argument, the prosecutor stated there were three ways the jury could convict Gonzalez of second degree murder. The first was by finding that Gonzalez committed intentional murder that was not premeditated and deliberate, as required to convict for first degree murder.

The prosecutor then told the jury: "The other way you can get to second-degree murder on Mr. Gonzalez—and there's actually two other ways, but I'm just going to talk about one for purposes of this rebuttal—and that's the theory of natural and probable consequence [*sic*]. And the way the law finds it is this: If you find that Mr. Gonzalez and Mr. Velazquez were out that night engaging in what's called an assault by means of force likely to produce great bodily injury, they were engaged in conduct that was likely to produce an assaultive great bodily injury on somebody. And as a result of that assault by means of force likely to produce great bodily injury, Alexis Velazquez actually killed somebody, in this case Mr. Antonio. Mr. Gonzalez is guilty of second-degree murder if

11

you believe that that murder that Mr. Velazquez committed was a natural and probable consequence of the assault by means of force likely to produce great bodily injury."[7]

The jury found Gonzalez not guilty of first degree murder and guilty of second degree murder.

In *People v. Sanchez* (2022) 75 Cal.App.5th 191, the appellate court addressed the effect of Senate Bill 775 on an attempted murder conviction where the trial court instructed the jury on a valid theory (aiding and abetting) and an invalid theory (natural and probable consequences). The *Sanchez* court held that where the jury is instructed on both legally valid and invalid theories, the murder conviction must be reversed unless the court can determine beyond a reasonable doubt that the jury based its verdict on a legally valid theory. The appellate court "presume[s] the legally invalid theory infected the verdict because jurors are not ' " 'equipped to determine whether a particular theory of conviction submitted to them is contrary to law . . . .' " ' [Citation.] We 'must reverse the conviction[s] unless, after examining the entire cause, including the evidence, and considering all relevant circumstances,' we determine the error is 'harmless beyond a reasonable doubt.' " (*Sanchez, supra*, at pp. 196-197; see *In re Martinez* (2017) 3 Cal.5th 1216, 1224; *People v. Aledamat* (2019) 8 Cal.5th 1, 13.)

The Attorney General argues that "the record demonstrates that the retroactive instructional error was harmless beyond a reasonable doubt" because "there was overwhelming evidence that Gonzalez participated directly in the murder," citing evidence that: Gonzalez joined a fellow gang member, Velazquez, in hood checking the Casa del Sol mobile home park; Velazquez armed himself with a knife after a resident pulled a knife; Gonzalez and Velazquez chased down Antonio; Gonzalez held Antonio,

**7** The other way Gonzalez could be convicted of second degree murder was direct aider and abettor liability. The jury was instructed with CALCRIM Nos. 400 and 401 regarding aider and abettor liability.

whose pleas for mercy Gonzalez and Velazquez ignored while Velazquez stabbed him; Velazquez stood over Antonio as they dropped him to the ground; Gonzalez was seen with a knife afterwards; Velazquez and Gonzalez fled and hid in a trailer; and Antonio died from stab wounds.

Here, however, the prosecutor relied heavily in rebuttal argument on the natural and probable consequences doctrine rendered invalid by Senate Bill 1437 and Senate Bill 775, and did not discuss direct aider and abettor liability.  (See *In re Martinez, supra*, 3 Cal.5th at pp. 1226-1227 [evidence does not compel conclusion that jury relied on direct aider and abettor theory where prosecutor argued natural and probable consequences doctrine at length in closing argument and rebuttal].)  The Attorney General suggests rebuttal argument is less influential.  We disagree.  The prosecutor's rebuttal argument constitutes "an especially critical period of trial," coming immediately before the jury begins to deliberate.  (*People v. Pitts* (1990) 223 Cal.App.3d 606, 694; see also *U.S. v. Ayala-Garcia* (1st Cir. 2009) 574 F.3d 5, 20 ["the rebuttal context increased the likelihood of prejudice because the improper remarks were among 'the last words spoken to the jury by the trial attorneys' "].)  The last thing the jury heard was the prosecutor urging the natural and probable consequences doctrine as a basis on which to convict Gonzalez of murder if jurors harbored doubts that the evidence showed he was a directly involved in Antonio's death.

Moreover, the court also instructed the jury that "the prosecution has alleged multiple theories of liability for second-degree murder" against Gonzalez.  The court advised the jury: "If the jury does not unanimously agree that Justin Gonzalez committed first-degree murder, it may still find him guilty of second-degree murder if all 12 jurors unanimously agree that second-degree murder was committed under one of three theories:  [¶]  One, he directly committed the murder as defined in other instructions; [¶] Two, he aided and abetted a murder, as defined in other instructions; [¶] Or, [¶] Three, he aided and abetted Alexis Velazquez in the target offense of assault by mean of force

13

likely to produce great bodily injury, as that crime is defined in other instructions, and the murder was a natural and probable consequence of that target offense, as that theory of liability is explained in other instructions. [¶] In order to return a guilty verdict against Justin Gonzalez for second-degree murder, the jury must be unanimous in its findings of guilt, but all 12 jurors do not need to agree on the theory of liability that establishes guilt of second-degree murder. [¶] Further, the individual jurors do not need to decide amongst the three theories for second-degree murder, so long as each juror is convinced that at least one theory applies."

Thus, the jury instructions do not establish that jurors did not convict Gonzalez under the theory of natural and probable consequences. To the contrary, the instructions informed the jury that it could convict Gonzalez of second degree murder if one juror embraced the natural and probable consequences theory, while the other 11 were convinced he was guilty under the other two theories.[8]

We conclude the error in instructing the jury on the natural and probable consequences doctrine is not harmless beyond a reasonable doubt and the verdict against Gonzalez must be reversed.[9]

We agree with the Attorney General that where, as here, a defendant secures a reversal on appeal of his or her conviction due to trial error other than insufficiency of the evidence, the defendant is subject to retrial. (*People v. Hernandez* (2003) 30 Cal.4th 1, 6;

---

[8] In our prior opinion, we rejected the Attorney General's argument that the jury's finding Gonzalez guilty on count 2 for criminal street gang activity (§ 186.22, subd. (a)) demonstrated that the trial court's error in instructing the jury on the natural and probable consequences doctrine was harmless. In light of our reversal of Gonzalez's count 2 conviction under the legislative amendments made by Assembly Bill 333, this argument is moot and we do not address it.

[9] In light of this conclusion, we do not address as moot Gonzalez's other claims regarding, inter alia, failure to provide discovery, admission of a jailhouse telephone call, prosecutorial misconduct, cumulative error, imposition of consecutives sentences, and ineffective assistance of counsel.

see also *In re D.N.* (2018) 19 Cal.App.5th 898, 902 ["Double jeopardy forbids retrial after a reversal due to insufficient evidence to support the verdict. [But] [w]here the prosecution makes its case under the law as it stood at trial, double jeopardy is not implicated as it would otherwise be where there is evidentiary insufficiency"].)

II

*Velazquez's Contention*

Velazquez contends the trial court erred in responding to a jury question regarding the meaning of the phrase "knowing the consequences" in CALCRIM No. 521, the pattern instruction on first degree murder. Velazquez argues that the court's use of language taken from *Cordero, supra*, 216 Cal.App.3d 275 to formulate a response to the jury's question "diminished the requirement that the prosecution prove that [Velazquez] carefully considered whether or not to kill and the consequences of his action." We disagree.

CALCRIM No. 521, as given by the trial court, instructed the jury in relevant part: "A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if he intended to kill. The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death."

On the third day of deliberations, the jury sent a note that quoted the sentence of CALCRIM No. 521 containing the phrase "knowing the consequences" and asked: "In the highlighted section, is it consequences for the *defendant* or for the *victim*?"

The next day the trial court addressed the jury's question. The prosecutor was present and Velazquez's counsel was on the telephone. The court held an off-the-record discussion with counsel, which the court summarized on the record, as follows: The night before the court had received a proposed answer from the prosecutor based on

15

*Cordero.* "The jury in that case asked a question of the Court that is almost exactly the same as the juror question here . . . and *Cordero* found that the Court should have answered it in a substantive way rather than just referring the jurors back to the instructions." The trial court noted that prosecution's draft instruction was drawn "almost verbatim from the language in *Cordero.*"

The court read the draft response: "The consequences contemplated in instruction 521 are those flowing from the act of killing. In this context, the law does not require that a Defendant's reflection specifically concern the consequences to the killer, the victim, or any other particular thing. The killer need only reflect on some consequence of the act about to be committed."

The court stated that Gonzalez's counsel agreed with the draft response but counsel for Velazquez did not. However, Velazquez's counsel "did waive his right to come in and argue it at this time, and instead he's going to put his comments on the record at the next appearance." The court then stated its intention to give the jury the response drafted by the prosecution and handed it to the bailiff. Less than two hours later, the jury reached a verdict.

Counsel for Velazquez thereafter put his objection on the record: "As I indicated, I guess off the record technically, that we would object to any further instruction of the jury. We would submit—we would say it was an impermissible pinpoint instruction violative of my client's due process rights under the Fourteenth Amendment of the U.S. Constitution." The court responded, "Thank you. That objection is noted."

The Attorney General contends that "Velazquez's failure to contemporaneously and specifically object to the court's response forfeited this claim on appeal." However, the cases the Attorney General cites found forfeiture where a defendant *consented* to the court's proposed answer to a jury question. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 ["Inasmuch as defendant both suggested and consented to the responses given by the court, the claim of error has been waived"], disapproved on another ground in *People*

*v. Leon* (2020) 8 Cal.5th 831, 848; *People v. Dykes* (2009) 46 Cal.4th 731, 798 [rejecting claim of error in court's response to jury question in part because "the answer to the jury's question was approved by defense counsel"].)

Here, Velazquez's counsel made an objection to the court's proposed answer in a discussion off the record but reserved his statement of grounds until his next appearance in court. While in hindsight one may question the wisdom of this two-part approach, it does not amount to forfeiture of the issue on appeal by failure to object. Moreover, we conclude that the court's definition of "consequences," like any other instruction given to the jury, may be reviewed even in the absence of an objection for the purpose of determining if "the substantial rights of the defendant were affected thereby." (§ 1259.)

Even so, Velazquez's claim fails on the merits. Velazquez agrees that the trial court did not abuse its discretion by answering the jury's question that "consequences" meant consequences to the defendant or the victim. He argues that the court erred when it "expounded unnecessarily on the meaning of consequences and adopted language in *Cordero*." According to Velazquez, this language was misleading and incorrect because it included that the requisite reflection on the consequences of a killing could concern "any other particular thing" and need only involve "some consequence." Velazquez's position is that the court's response wrongly informed the jury that considering an "insignificant," "trivial," or "negligible" consequence would be sufficient reflection to constitute "deliberation." Such consequences, Velazquez maintains, do not "rise to the level of the careful reflection for and against the defendant's course of action," but "will require little reflection and not the careful weighing for and against killing that is required to constitute 'deliberation.' "

Velazquez misses the point of the language from *Cordero* adopted by the trial court. This language properly encompasses other consequences besides those pertaining to the defendant or the victim. As the appellate court explained: "Homicides occur in diverse factual settings and the thought processes invoked by assailants are varied; in

17

many instances an assailant will contemplate consequences to *both* the victim and to his or her own future. In other cases, the deliberation will simply invoke consequences to a third party or even an idea or strongly held principle (e.g., politically or religiously motivated assassinations)." (*Cordero, supra*, 216 Cal.App.3d at p. 281.)

To impose a requirement that the "consequence" must rise to a certain level puts the subject matter of the consequence over the reflection on killing that distinguishes first degree murder. In the passage containing the language that Velazquez now challenges, the court in *Cordero* further explained: "The 'consequences' contemplated in [the pattern jury instruction] are those flowing from the act of killing—it is this act which must be premised upon 'reflection.' It is this preexisting reflection that elevates murder to its highest degree. Nowhere does the law require this reflection specifically to concern the consequences to the killer, the victim, or any other particular thing. The killer need only reflect on *some* consequence of the act about to be committed." (*Cordero, supra*, 216 Cal.App.3d at p. 282.)

Thus, it would have been insufficient for the trial court to answer the jury's specific question simply that consequences could be to the defendant or the victim. The requisite reflection could involve a consequence to something besides the defendant or the victim.

We find Velazquez's concern that the jury may consider reflection on some minimal consequence sufficient for deliberation to be overblown. As the court told the jury, reflection must concern consequences "flowing from the act of killing." Killing is an act incompatible with reflection on inconsequential matters.

Moreover, the consequences the jury may consider flowing from the killing are all those "established by the evidence." (*Cordero, supra*, 216 Cal.App.3d at p. 283.) The evidence here included Velazquez's boast from jail to a gang associate that Gonzalez had validated him in VBN because of Antonio's murder. This is evidence that the consequences Velazquez contemplated flowing from the killing were the benefit to

18

Varrio Bosque Norteño and his status in the gang. Such consequences are not insignificant, trivial or negligible.

Given that the jury was confused as to whether the phrase "knowing the consequences" in CALCRIM No. 521 referred to consequences to the defendant or victim, it was appropriate for the trial court to inform the jury that the phrase referred to consequences to the defendant, victim or some other consequence "flowing from the act of killing."

## III

### *Petitions for Rehearing*

The jury found both Gonzalez and Velazquez guilty on standalone counts of criminal street gang activity in violation of section 186.22, subdivision (a). The jury also found true two gang enhancements against Velazquez, i.e., that Velazquez committed first degree murder at the direction of, for the benefit of, or in association with the VBN criminal street gang (§ 186.22, subd. (b)(1)) and the special circumstance that Velazquez was an active participant in VBN and carried out the murder to further the activities of the criminal street gang. (§ 186.22, subd. (f), 190.2, subd. (a)(22).)[10]

Under the amendments to section 186.22 made by Assembly Bill 333, we reverse the gang participation convictions against Gonzalez and Velazquez and vacate the gang enhancements against Velazquez.

Assembly Bill 333 made a number of substantive changes to section 186.22 that apply here. (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477 (*E.H.*).) "Previously, the statute defined a 'criminal street gang,' as 'any ongoing organization, association, or

---

[10] The jury also found true a gang enhancement that Gonzalez committed second degree murder for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1).) Since we reverse Gonzalez's murder conviction, the related enhancement is necessarily reversed as well. (See *People v. Leon* (2008) 161 Cal.App.4th 149, 164, fn. 8.)

19

group of three or more persons . . . whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity.' (Former section 186.22, subd. (f), italics added.) Assembly Bill 333 narrowed the definition to 'an ongoing, organized association or group of three or more persons . . . whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity.' (Assem. Bill 333, § 3, revised § 186.22, subd. (f), italics added.)" (*E.H., supra*, at p. 477.) "[W]e read the term 'collectively' in a commonsense manner to mean what it says—committed by more than one person." (*People v. Delgado* (2022) 74 Cal.App.5th 1067, 1088 (*Delgado*).)

Assembly Bill 333 also amended the definition of "pattern of criminal gang activity." (*E.H., supra*, 75 Cal.App.5th at p. 477.) Previously, under section 186.22, former subdivision (e), "the prosecution needed to prove 'only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another.' " (*E.H.*, at p. 477, fn. omitted, quoting *People v. Sek* (2022) 74 Cal.App.5th 657, 665 (*Sek*).) " 'The offenses comprising a pattern of criminal gang activity are referred to as predicate offenses.' [Citation.]" (*People v. Rodriguez* (2022) 75 Cal.App.5th 816, 822 (*Rodriguez*).) "Prior to Assembly Bill 333, it was unnecessary to prove predicate offenses were gang related." (*Ibid.*, fn. omitted.) "[T]he predicate offenses now must have been committed by two or more 'members' of the gang [and] must be proven to have '*commonly* benefited a criminal street gang.' " (*E.H., supra*, at p. 477.)

Further, Assembly Bill 333 added section 186.22, subdivision (g), which "requires the prosecution to prove the benefit the gang derives from the predicate and current offenses is 'more than reputational.' " (*E.H., supra*, 75 Cal.App.5th at p. 478, citing Stats. 2021, ch. 699, § 3.) Subdivision (g) of section 186.22 provides: "As used in this chapter, to benefit, promote, further, or assist means to provide *a common benefit to members of a gang where the common benefit is more than reputational*. Examples of a common benefit that are more than reputational may include, but are not limited to,

20

financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (Italics added.)

Thus, Assembly Bill 333 "adds new elements to the substantive offense and enhancements in section 186.22—for example, by requiring proof that gang members 'collectively engage' in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and underlying offenses provided more than a reputational benefit to the gang . . . ." (*E.H., supra*, 75 Cal.App.5th at p. 479; see also *Sek, supra*, 74 Cal.App.5th at p. 668.)

Numerous courts have determined that the substantive changes to section 186.22 made by Assembly Bill 333 apply retroactively to all cases in which the judgment is not final, "because the changes 'redefine, to the benefit of defendants, conduct subject to criminal sanctions.' " (*E.H., supra*, 75 Cal.App.5th at p. 478; see also *People v. Lopez* (2021) 73 Cal.App.5th 327, 343-344; *Delgado, supra*, 74 Cal.App.5th at p. 1087; *Rodriguez, supra*, 75 Cal.App.5th at p. 822 ["Assembly Bill 333 amended section 186.22 to, in various respects, *increase* the evidentiary burden necessary to prove a gang-related crime enhancement. We conclude the amendment is ameliorative and applies retroactively to cases not yet final on appeal"].) The judgments against Gonzalez and Velazquez involving section 186.22 are not final. (See *People v. Vieira, supra*, 35 Cal.4th at p. 306 [" '[A] judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed' "].)

Gonzalez and Velazquez contend, and we agree, that the gang evidence presented at trial was insufficient to support the gang convictions and enhancements under section 186.22, as amended by Assembly Bill 333. As noted above, the prosecution offered Investigator Moe as a gang expert to testify regarding " 'predicate offenses,' " i.e., other crimes involving active VBN members. The first of these was Gonzalez's prior felony

21

conviction for the offenses of (1) conspiracy to commit assault with a deadly weapon with a gang enhancement; and (2) criminal street gang activity. The trial court admitted as an exhibit a certified copy of the record of conviction. Each of the charges against Gonzalez were resolved by a no contest plea. While numerous defendants were named in the operative complaint, there was no evidence presented that Gonzalez committed the offenses collectively with other gang members for the common benefit of the VBN gang. (See *Rodriguez, supra*, 75 Cal.App.5th at p. 823; *People v. Lopez, supra*, 73 Cal.App.5th at p. 345.)

Moe also testified to a second predicate offense involving the conviction of Mitchell Alan Contreras of three counts of assault with a firearm, including gang and firearm enhancements. The information included in the certified record of Contreras's conviction admitted as an exhibit by the trial court named only Contreras as a defendant. The case was also resolved by a no contest plea. Moe did not testify that any other gang member was involved in the crimes, hence there was no evidence of collective criminal activity. (See *Delgado, supra*, 74 Cal.App.5th at p. 1090.)[11]

Moe also testified regarding the importance of respect to VBN and that VBN gang members commit provoked and unprovoked assaults to earn "respect." Moe explained that VBN gang members engage in intimidating conduct intended to induce fear in the community to ensure community members would not testify or cooperate with law enforcement against the gang. The prosecutor posed hypotheticals to Moe that focused on actions by VBN gang members taken in response to disrespect and for the purpose of maintaining respect. This evidence raises the possibility that the jury concluded that the

---

[11] Since to prove a pattern of criminal activity required evidence of two predicate offenses, the prosecution's inability to provide valid evidence of either predicate would be a sufficient basis to reverse the gang crimes and enhancements. (See *Delgado, supra*, 74 Cal.App.5th at p. 1090, fn. 18.)

prosecution had proved a pattern of gang activity based on acts that merely benefited the reputation of VBN. (See *Sek, supra*, 74 Cal.App.5th at p. 669; *E.H., supra*, 75 Cal.App.5th at p. 480.)

The Attorney General concedes that Velasquez's criminal street gang activity convictions and the true findings on his gang enhancements should be reversed under Assembly Bill 333, with the exception of the gang-murder special circumstance under section 190.2, subdivision (a)(22).

Section 190.2, subdivision (a)(22) was enacted in March 2000 by a voter referendum, Proposition 21. (*People v. Shabazz* (2006) 38 Cal.4th 55, 64-65.) The Attorney General contends that changes Assembly Bill 333 made to the definition of " 'pattern of criminal gang activity' " (§ 186.22, subd. (e)) and " 'criminal street gang' " (§ 186.22, subd. (f)) constituted an unconstitutional amendment of section 190.2, subdivision (a)(22), which incorporates these definitions.[12] (See Cal. Const., art. II, § 10, subd. (c) ["The Legislature . . . may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval"].) Proposition 21 permits amendment by a two-thirds vote of both houses of the Legislature. (*People v. Rojas* (2022) 80 Cal.App.5th 542, 551, review granted Oct. 19, 2022, S275835 (*Rojas*).) Assembly Bill 333 was not passed by a two-thirds vote. (*Rojas, supra*, at pp. 553, 555.)

The Attorney General argues that by narrowing these definitions, Assembly Bill 333 narrowed the scope of section 190.2—which incorporates section 186.22,

---

[12]    Section 190.2 provides that the punishment for a person convicted of first degree murder is the death penalty or life without parole if certain "special circumstances" are found true, including "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, *as defined in subdivision (f) of section 186.22,* and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22), italics added.)

23

subdivision (f), defining a "criminal street gang," which in turn incorporates the "pattern of gang activity" language in section 186.22, subdivision (e)—thereby "it appears" that it amended section 190.2 without the two-thirds vote of both houses of the Legislature required by Proposition 21. (*Rojas, supra*, 80 Cal.App.5th at p. 555, rev.gr.)

Velazquez disagrees, asserting that Assembly Bill 333 "did not amend the language of section 190.22[, subdivision] (a)(22), only the definition of a criminal street gang," and "the electorate in enacting Proposition 21 did not freeze the definition of a criminal street gang" as of 2000, when Proposition 21 was adopted. We agree with Velazquez.

Courts are split on this issue. The Attorney General relies on *Rojas*, in which a divided panel of the Fifth District concluded that Assembly Bill 333 "would reduce the scope of murders punishable under section 190.2, subdivision (a)(22)" and thus it " 'takes away' [citation] from Proposition 21." (*Rojas, supra*, 80 Cal.App.5th at p. 554, rev.gr.) "A legislative enactment amends an initiative if it 'prohibits what the initiative authorizes, or authorizes what the initiative prohibits.' [Citation.] A legislative enactment also amends an initiative 'by taking away from it.' [Citations.] [¶] Consequently, a legislative enactment can be deemed an amendment to an initiative, even when it does not change the specific language enacted by the initiative itself. [Citations.]" (*Id.* at pp. 553-554.) The *Rojas* court further concluded that punishment of the crime is not distinct from the definition of the crime. (*Id.* at pp. 555-557 ["Since punishment is the *application* of a criminal penalty *to* a particular universe of conduct, narrowing that universe effects a change in *punishment* with respect to the newly excluded conduct. This is true even when the penalty attached to the remaining conduct remains unchanged"], rejecting *People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270.)

Velazquez, on the other hand, relies on *People v. Lee* (2022) 81 Cal.App.5th 232, review granted October 19, 2022, S275449 (*Lee*). In *Lee*, Division Four of the Second

District concluded "that in enacting Proposition 21, the voters did not contemplate a time-specific incorporation of the then-current version of section 186.22, subdivision (f), into the gang-murder special-circumstance statute." (*Lee, supra*, at p. 241.) The court noted that the Legislature originally enacted section 186.22, subdivision (f) in 1987. (*Lee*, at p. 242.) While Proposition 21 made a number of changes to other provisions of section 186.22, "the voters reenacted section 186.22, subdivision (f) without substantive change." (*Lee*, at p. 242.) "As such, subdivision (f) of section 186.22 cannot be deemed 'among the initiative's statutory provisions' made immune from legislative amendment by force of article II, section 10 of the state Constitution." (*Lee*, at p. 242.) The court also observed that Proposition 21 included provisions freezing statutory definitions, e.g., in amendments to the Three Strikes law, but not in section 186.22, subdivision (f). (*Lee*, at pp. 242-243.)

The court in *Lee* further explained that legislation that concerns the same subject matter as an initiative is not necessarily an amendment. (*Lee, supra*, 81 Cal.App.5th at p. 243, rev.gr.) The Legislature is free to address a " ' " ' "related but distinct area" ' " ' " or a matter that an initiative measure " ' " 'does not specifically authorize *or* prohibit.' " ' " (*Lee*, at p. 243.) The court reasoned that Assembly 333 does not prohibit what Proposition 21 authorizes or authorize what Proposition 21 prohibits. (*Lee*, at p. 243.) "[T]he initiative was aimed in pertinent part at increasing the sentences for 'gang-related' felonies and murder. There was no distinction suggesting that what constitutes a 'gang-related' murder was frozen in time for section 190.2, subdivision (a)(22), but what constitutes a 'gang-related' felony for section 186.22 was not." (*Lee*, at p. 244.)[13] Applying Assembly Bill 333 to the section 186.22, subdivision (f) reference in section

---

[13]    The Attorney General acknowledges that "considerable confusion" is likely to result if there are different definitions of "pattern of criminal gang activity" and "criminal street gang" for a gang-murder special circumstance versus a felony gang enhancement.

190.22 does not change the increased punishments for gang-related murder. (*Lee*, at p. 244.) Assembly Bill 333 "simply refines the concept of what constitutes a 'gang-related' murder," because "the original definition of a criminal street gang was not narrowly focused on punishing true gang-related crimes," and tended to lump people into a gang based on their family members or neighborhoods and even mischaracterizing social networks formed to suppress gangs as gangs. (*Lee*, at p. 244, 245.) The court concluded "the term 'criminal street gang' as incorporated in the gang-murder special circumstance statute was 'intended to conform at all times' and 'remain permanently parallel' to section 186.22." (*Lee*, at p. 245.)

In *People v. Lopez* (2022) 82 Cal.App.5th 1 (*Lopez*), relying on *Lee*, a panel of justices from the Fifth District different from the one that decided *Rojas* rejected a similar argument from the Attorney General that Assembly Bill 333 improperly amended the gang conspiracy statute, section 182.5, enacted as part of Proposition 21.[14] The court determined there was no time-specific provision in Proposition 21 for section 182.5 as there was for other provisions of the criminal law. (*Lopez, supra*, at pp. 23-24.) The court concluded, "[W]e agree with *Lee*'s conclusion that 'the electorate clearly knew how to express the intent to freeze a statutory definition,' " and "[t]he absence of such time-specific language in section 182.5 leads to our rejection of the People's claim." (*Lopez*, at pp. 24-25.)

---

[14] Section 182.5 provides in relevant part that "any person who actively participates in any criminal street gang, as defined in subdivision (f) of Section 186.22, with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, as defined in subdivision (e) of Section 186.22, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang is guilty of conspiracy to commit that felony . . . ."

We likewise agree with the reasoning in *Lee* and *Lopez*. Applying Assembly Bill 333, the section 190.2, subdivision (a)(22) special circumstance found true against Velazquez must be reversed.

For the foregoing reasons, we reverse the gang crime convictions and vacate the true findings on the gang-murder special circumstance and gang enhancements. We remand the case to allow for retrial should the prosecutor so choose. (*Sek, supra*, 74 Cal.App.5th at p. 669; *Delgado, supra*, 74 Cal.App.5th at p. 1091; *E.H., supra*, 75 Cal.App.5th at p. 480.)

## DISPOSITION

Gonzalez's murder conviction on count 1 is reversed, including the related finding as to the associated section 186.22, subdivision (b)(1) enhancement. Gonzalez's conviction on count 2 (§ 186.22, subd. (a)) is reversed. We remand the matter to the trial court with instructions that the People may, if they choose, retry Gonzalez on count 1, including the enhancement under section 186.22, subdivision (b)(1), as well as on count 2 (§ 186.22, subd. (a)), within the time limit prescribed by law. If the People choose not to retry, the trial court is directed to impose an appropriate disposition.

Velazquez's conviction on count 2 is reversed and the section 186.22, subdivision (b)(1) enhancement and gang-murder special circumstance under sections 186.22, subdivision (f), and 190.2, subdivision (a)(22) are vacated. We remand the matter to the trial court with instructions that the People may, if they choose, retry Velazquez on count 2 (§ 186.22, subd. (a)) and the gang enhancements and gang-murder special circumstance on count 1. If the People choose not to retry, the trial court is directed to resentence Velazquez on count 1.

The judgment is otherwise affirmed.

                                    _____KRAUSE_____, J.


We concur:


_____MAURO_____, Acting P. J.


_____EARL_____, J.